# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

_____

SIERRA CLUB NORTH STAR
CHAPTER,

           Plaintiff,


v.                                          **MEMORANDUM OF LAW & ORDER**
                                            Civil File No. 07-2593 (MJD/SRN)


MARY PETERS, Secretary of
Transportation; J. RICHARD
CAPKA, Federal Highway
Administrator; DIRK
KEMPTHORNE, Secretary of
the Interior; and MARY BORNAR,
Directory of the National Park
Service;

           Defendants.

_____

Brian B. O'Neill, Elizabeth H. Schmiesing, Kristen M. Gast, Michael C. Soules,
and Richard A. Duncan, Faegre & Benson, LLP, Counsel for Plaintiff.

Friedrich A. P. Siekert, Assistant United States Attorney, Counsel for Defendants.
_____

## I.      INTRODUCTION

      This matter is before the Court on Defendants' Motion to Dismiss for Lack

of Jurisdiction.  [Docket No. 16]  The Court heard oral argument on February 22,

2008.

## II.     BACKGROUND

### A.     Statutory Framework

#### 1.     National Environmental Policy Act ("NEPA")

The NEPA is a procedural statute that requires federal agencies to prepare

a detailed environmental impact statement ("EIS") for "major Federal actions

significantly affecting the quality of the human environment."  42 U.S.C.

§ 4332(2)(C).  An agency's EIS should "[r]igorously explore and objectively

evaluate all reasonable alternatives," but need only "briefly discuss" the reasons

why other alternatives were eliminated from more detailed study.  40 C.F.R.

§ 1502.14.  Additionally, an EIS should identify the direct, indirect, and

cumulative impacts of each alternative that is studied and consider mitigation

measures to reduce any impacts on the environment.  40 C.F.R. §§ 1502.14,

1502.16, 1508.7.

#### 2.     Section 4(f) of the Department of Transportation Act of 1966

Generally, under Section 4(f),

the Secretary may approve a transportation program or project . . .

requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance . . . only if–

(1) there is no prudent and feasible alternative to using that land; and

(2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303(c).

Federal Highway Administration ("FHWA") regulations require that, for projects subject to the section 4(f) requirement, the 4(f) evaluation shall document why there is no "feasible and prudent" alternative and the planning measures taken to "minimize harm" to the property.  49 C.F.R. § 266.19(b)(4) (formerly set forth at 23 C.F.R. § 771.135(j)).  Additionally, a final EIS or Finding of No Significant Impact ("FONSI") should document compliance with applicable requirements, include Section 4(f).  23 C.F.R. § 771.133.

### 3.    Wild and Scenic Rivers Act ("WSRA")

The WSRA was enacted in 1968 to preserve the free-flowing condition of certain rivers.  16 U.S.C. § 1271.  The WSRA created a national Wild and Scenic River System and developed a process so that other rivers with "outstandingly

remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural or

other similar values, shall be preserved in free-flowing condition." Id.  The

WSRA identifies the rivers in the System, sets forth a procedure by which

additional rivers may be added, and provides guidance on how the designated

rivers should be managed.  16 U.S.C. §§ 1271-87.

The location of a wild and scenic river segment determines whether it is

administered by the Secretary of the Interior, including the National Park Service

("NPS"), or the Secretary of Agriculture.  16 U.S.C. § 1281(c), (d).  The

administering agency must manage each designated river segment "in such

manner as to protect and enhance the values which caused it to be included in

said system without, insofar as is consistent therewith, limiting other uses that do

not substantially interfere with public use and enjoyment of these values."  16

U.S.C. § 1281(a).  Because designated rivers are usually administered by the

Secretary of Agriculture through the United States Forest Service, Department of

Agriculture regulations govern the implementation of WSRA requirements.  36

C.F.R. § 297.1, et seq.

The upper stretch of the St. Croix River was one of the rivers originally

included in the Wild and Scenic River System.  16 U.S.C. § 1274(a)(6).  The Lower

4

St. Croix was later added.  16 U.S.C. § 1274(a)(9).

Section 7 provides that "no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration."  16 U.S.C. § 1278(a).  Thus, Section 7 requires the NPS to evaluate whether a "water resources project . . . would have a direct and adverse effect" on a river's values.  When a water resources project is found to have a "direct and adverse effect" on a wild and scenic river, the project cannot be authorized or funded absent congressional intervention.  Id.

A water resources project is "any dam, water conduit, reservoir, powerhouse, transmission line, or other project works under the Federal Power Act . . . or other construction of developments which would affect the free-flowing characteristics of a Wild and Scenic River or Study River."  36 C.F.R. § 297.3.

"Federal assistance means any assistance by an authorizing agency including, but not limited to, . . . [a] license, permit, or other authorization granted by the Corps of Engineers, Department of the Army, pursuant to the

Rivers and Harbors Act of 1899 (33 U.S.C. 401 et seq.), and section 404 of the

Clean Water Act (33 U.S.C. 1344)." Id.

### 4.   Organic Act and General Authorities Act

The National Park Service Organic Act of 1916 ("Organic Act") established

the NPS and created its authority over the maintenance of national parks.  16

U.S.C. §§ 1 – 18f-3.  The Organic Act provides that the NPS must "regulate the

use" of national parks by means that conform to their "fundamental purpose,"

namely:

> to conserve the scenery and the natural and historic objects and the
> wild life therein and to provide for the enjoyment of the same in
> such manner and by such means as will leave them unimpaired for
> the enjoyment of future generations.

16 U.S.C. § 1.

Congress later passed an amendment to the Organic Act, known as the

General Authorities Act, which provides:

> The authorization of activities shall be construed and the protection,
> management, and administration of these areas shall be conducted
> in light of the high public value and integrity of the National Park
> System and shall not be exercised in derogation of the values and
> purposes for which these various areas have been established, except
> as may have been or shall be directly and specifically provided by
> Congress.

16 U.S.C. § 1a-1.  The NPS has construed the "derogation" standard in the General Authorities Act as a reiteration of the non-impairment standard set forth in the Organic Act - that is, a duty to prohibit the impairment of the integrity of park resources and values.  NPS Management Policies § 1.4.2 (2006).

**B.     Factual Background**

**1.     The Parties and the River**

Plaintiff is the Sierra Club North Star Chapter ("Sierra Club").  Defendants are Mary Peters, Secretary of Transportation; J. Richard Capka, the Federal Highway Administrator; Dirk Kempthorne, Secretary of the Interior; and Mary Bornar, Director of the National Park Service.  This case relates to a proposed bridge that would cross the Lower Saint Croix River near Oak Park Heights, Minnesota.

The Lower St. Croix runs along the Minnesota-Wisconsin border.  (Compl. ¶ 2; Answer ¶ 2.)  The Cooperative Management Plan, adopted in 2001, governs management of the Lower St. Croix National Scenic Riverway.  (Compl. ¶ 17; Answer ¶ 17.)  The Riverway is jointly administered by the NPS, the Minnesota Department of Natural Resources, and the Wisconsin Department of Natural Resources, who manage the Riverway through the Lower St. Croix Management

Commission.  (Id.)

Currently, ten bridges traverse the St. Croix, including the Stillwater

Bridge, between Stillwater, Minnesota, and Houlton, Wisconsin.  Sierra Club N.

Star Chapter v. Peña, 1 F. Supp. 2d 971, 974 (D. Minn. 1998).  The Stillwater

Bridge connects Minnesota Trunk Highway 36 to Wisconsin State Trunk

Highway 64.  Id.

### 2.     1995 Bridge Proposal

The FHWA, Minnesota Department of Transportation, and Wisconsin

Department of Transportation have long sought to construct a new bridge over

the river.  These efforts resulted in a final EIS in April 1995, and a record of that

decision in July 1995.  Sierra Club N. Star Chapter, 1 F. Supp. 2d at 974; (Pl. Ex. F.)

The highway departments' preferred alternative was a four-lane bridge

that would cross the river about one mile south of Stillwater, Minnesota ("1995

Proposal").  The total length of the bridge would be six miles and there would be

eight bridge piers in the riverbed.  (Section 7(a) Evaluation; Wild and Scenic

Rivers Act; Proposed New St. Croix River Crossing ("1996 Section 7 Evaluation")

13-14, Pl. Ex. B.)  Because the 1995 Proposal would have required extensive

dredge and fill, the Clean Water Act required the transportation agencies to

obtain a "dredge and fill" permit from the Corps of Engineers ("Corps").  33

U.S.C. § 1344; <u>Sierra Club N. Star Chapter</u>, 1 F. Supp. 2d at 975.

In June 1996, the Sierra Club and another conservation group filed suit to

enjoin construction of the project.  Among other claims, Sierra Club alleged that

the Department of the Interior failed to discharge its obligation under the WSRA

to analyze whether the 1995 Proposal satisfied the standards of Section 7 of the

WSRA.  <u>Sierra Club N. Star Chapter</u>, 1 F. Supp. 2d at 975.

After Sierra Club filed suit, the NPS conducted the necessary Section 7

evaluation on the 1995 Proposal.  Because the FHWA had issued a Record of

Decision ("ROD") before the NPS completed a Section 7 evaluation, the FHWA

suspended its authorization of the 1995 Proposal pending the outcome of the

Section 7 process.  <u>Id.</u>; (<u>See also</u> Pl. Ex. G.)

On December 27, 1996, the NPS issued its WSRA Section 7 evaluation,

which concluded that the 1995 Proposal would have a direct and adverse impact

on the Lower St. Croix's scenic, recreational, and biological values.  (<u>See</u> 1996

Section 7 Evaluation.)  The evaluation particularly criticized the potential visual

impact of the proposed bridge.  (<u>Id.</u> at 62-63.)  The NPS's determination

prohibited other federal agencies from issuing permits, approvals, or

authorizations for the 1995 Project.  16 U.S.C. § 1278(a).

After the Section 7 evaluation was released, the federal government

withdrew its authorization and financial support for the 1995 Proposal.  In an

effort to save the project, the Minnesota and Wisconsin Departments of

Transportation ("state DOTs") intervened in Sierra Club's lawsuit and directly

challenged the Section 7 evaluation.

On April 13, 1998, the Court rejected the state DOTs' claims and upheld the

NPS determination.  Peña, 1 F. Supp. 2d at 983.

### 3.    2006 Bridge Proposal

On March 5, 1998, the Midwest Region of the NPS issued a memorandum

setting forth the "Policy for integrating National Park Service section 7

evaluations with the National Environmental Policy Act compliance process of

the project sponsor."  (Ex. A to Hanson Decl.)  The policy allows for preparation

of a draft Section 7 evaluation to be included, if possible, in the Draft EIS

prepared by the project sponsor and a final Section 7 evaluation for inclusion in

the final EIS, stating that, unless the project changes or new information becomes

available, the document represents the likely outcome of the Section 7

determination, which will be made in response to the Corps public notice.  (Id. at

7.)  See also 36 C.F.R. § 297.6 ("To the extent practicable, impacts on Wild and Scenic River values will be considered in the context of other review procedures provided by law.").

After the 1998 court decision, the FHWA and the state DOTs began working to revive the project.  (Compl. ¶ 72; Answer ¶ 72.)  In August 2004, they issued a supplemental draft EIS.  (Id.)  The document identified four "build" alternatives.  (Id.)  According to Sierra Club, Alternative B-1, was nearly identical to the 1995 Proposal.  (Compl. ¶ 72.)  Alternative B-1 contained two sub-alternatives: Alternative B-1a proposed closing the Stillwater lift bridge to vehicular traffic and converting it into a non-motorized pathway, while Alternative B-1b would leave the lift bridge open to local traffic.  (Id.; Answer ¶ 72.)

In October 2005, the NPS issued a draft Section 7 evaluation of the project. (Draft Section 7(a) Evaluation; Wild and Scenic Rivers Act; St. Croix River Crossing Project (October 2005) ("2005 Section 7 Evaluation"), Ex. B to Hanson Decl.)  In this draft, the NPS concluded that, given the proposed mitigation package, the proposed bridge's adverse effect on the scenic and recreational values of the Lower St. Croix would be adequately offset.  (Id. at 50-51.)

11

When the transportation agencies released the Supplemental Final EIS in June 2006, they chose Alternative B-1a as the Preferred Alternative.  (Compl. ¶ 73; Answer ¶ 73.)  This proposal ("Proposed Bridge") became the Selected Alternative when the FHWA issued its ROD in November 2006.  (Id.)  The Proposed Bridge would be located between Trunk Highway 36 in Stillwater and Oak Park Heights, Minnesota, and State Trunk Highway 64 in St. Joseph, Wisconsin, and would create a crossing in a new corridor.  (2005 Section 7 Evaluation at 1, 5.)  The Proposed Bridge would require dredge and fill in the waterway, necessitating a permit from the Corps under Section 404 of the Clean Water Act.  (Id. at 18-19.)  Additionally, the Proposed Bridge is a water resources project subject to Section 7(a) of the WSRA.  (Id. at 1.)  The project will require federal assistance in the form of funding from the FHWA and permits from the U.S. Coast Guard and the Corps.  (Id.)

Although the 2005 Section 7 Evaluation was a draft, it stated:  "If the scope of the project or mitigation package should change substantially, the NPS will need to reevaluate the project under Section 7(a).  If there is no substantial change, the draft determination will stand."  (2005 Section 7 Evaluation at 51-52.)  The NPS identified two main contingencies that must occur in order for the 2005

Section 7 Evaluation to become final.  The first contingency was the Visual

Quality Planning Process (id. at 45, 49, 51), which concluded in January 2007 (Pl.

Ex. D).  The second contingency was that the NPS sought assurances that the

mitigation items identified in the 2005 Section 7 Evaluation would be

implemented.  (Id. at 51-52.)  The NPS explained: "In addition, some of the

mitigation items are not yet assured.  If any of the identified Riverway mitigation

items cannot be implemented, the transportation agencies should consult with

the managing agencies to identify suitable replacement items."  (Id. at 52.)  Sierra

Club asserts that this issue was addressed in April 2006, when the NPS, FHWA,

state DOTs, and Minnesota and Wisconsin Departments of Natural Resources

entered into a Memorandum of Understanding for the Implementation of

Riverway Mitigation Items.  (Pl. Ex. E.)

        Sierra Club concludes that, because the Proposed Bridge did not change

materially between the supplemental draft EIS and the ROD, the NPS's "draft

determination [now] stand[s]."  (2005 Section 7 Evaluation at 52.)

                    **4.      FHWA Notice**

        In November 2006, the FHWA issued a ROD on the St. Croix River

Crossing Project.  (Compl. ¶ 73; Answer ¶ 73.)  On December 5, 2006, the FHWA

published a notice in the Federal Register stating that a number of federal agency

actions related to the St. Croix River Crossing Project were final.  71 Fed. Reg.

70580.  The notice stated:

> By this notice, the FHWA is advising the public of final agency
> actions subject to 23 U.S.C. 139(l)(1).  A claim seeking judicial review
> of the Federal agency actions of the highway project will be barred
> unless the claim is filed on or before June 6, 2007.  If the Federal law
> that authorizes juridical review of a claim provides a time period of
> less than 180 days for filing such claim, then that shorter time period
> still applies.

Id.  23 U.S.C. § 139(l)(1) provides that a claim must be filed within 180 days of

publication of notice in the Federal Register.  180 days from December 5, 2006

was Sunday, June 3, 2007, which meant that the deadline set by the statute was

Monday, June 4, 2007.  The notice misstated the deadline by two days.

Defendants assert that the NPS has still not released a final Section 7

evaluation; nor did it produce any other WSRA-related documents before the

FHWA published the ROD.

### C.    Procedural Background

On June 5, 2007, Sierra Club filed a Complaint against Defendants in this

Court.  The Complaint alleges

Count I, Violations of WSRA and the [Administrative Procedure Act]

14

["]APA["] by the NPS and FHWA based on the claim that the
Proposed Bridge project creates a new transportation corridor
without restoring the existing corridor to natural conditions;

Count II, Violations of the WSRA and the APA against the NPS
based on the claim that the NPS's 2005 Section 7 Evaluation wrongly
concluded that the Proposed Bridge project would not have a direct
and adverse effect on the Lower St. Croix's scenic, recreational,
wildlife, and other natural values;

Count III, Violations of the WSRA and the APA by the NPS, in the
alternative to Count II, based on the claim that if the NPS's 2005
Section 7 Evaluation was not final agency action, the NPS's failure to
issue a Section 7 determination represents "agency action unlawfully
withheld or unreasonably delayed;"

Count IV, Violations of the WSRA, Organic Act, General Authorities
Act, and the APA by the NPS based on the claim that the NPS's
approval of the Proposed Bridge is contrary to the non-degradation
and non-impairment policies promulgated under those statutes;

Count V, Violations of the WSRA and the APA by the NPS based on
the claim that NPS's grant of a new right-of-way for the Proposed
bridge does not protect the qualities for which the Lower St. Croix
was designated a wild and scenic river;

Count VI, Violations of the Transportation Act and the APA by the
FHWA, based on the claim that the FHWA violated Section 4(f) of
the Transportation Act by approving the Proposed Bridge without
adequately considering alternatives that could have avoided use of
the Lower St. Croix Riverway and approving a project that does not
minimize harm to the Riverway; and

Count VII, Violations of NEPA and the APA by the FHWA based on
the claim that the FHWA violated the NEPA due to inadequacies in

the EISs and ROD.

Defendants now move to dismiss this case based on lack of subject matter jurisdiction because 1) as to the claims against the FHWA, Plaintiff failed to file its Complaint within the statutory 180-day limitations period; and 2) as to claims against the NPS, the Complaint does not challenge a final agency action as required by the APA.

## III. DISCUSSION

### A. Standard of Review

Plaintiff bears the burden of establishing the Court's subject matter jurisdiction. Jones v. Gale, 470 F.3d 1261, 1265 (8th Cir. 2006).

> In order to properly dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), the complaint must be successfully challenged on its face or on the factual truthfulness of its averments. In a facial challenge to jurisdiction, all of the factual allegations concerning jurisdiction are presumed to be true and the motion is successful if the plaintiff fails to allege an element necessary for subject matter jurisdiction.

Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993) (citations omitted). In a factual challenge, the Court may examine competent evidence outside of the complaint. Id.

Sovereign immunity protects the United States from being

sued unless Congress has expressly waived the government's
immunity.  A district court lacks jurisdiction to hear a case against
the United States unless its sovereign immunity has been waived,
and the court's jurisdiction is limited by the scope of the waiver.  [A]
waiver of the government's sovereign immunity will be strictly
construed, in terms of its scope, in favor of the sovereign.  Once
consent has been expressly provided and its scope defined, however,
the waiver of immunity is liberally construed within the parameters
of the consent.

Kaffenberger v. United States, 314 F.3d 944, 950 (8th Cir. 2003) (citations omitted).

### B.      180-Day Limitation

#### 1.      Introduction

Defendants assert that the claims against the FHWA are barred by the 180-

day statute of limitations and must be dismissed with prejudice.

##### a.      Standard of Review

Defendants' statute of limitations challenge to the FHWA claims is based

on the pleadings and, therefore, presents a facial challenge to jurisdiction.  In a

facial challenge, "the court restricts itself to the face of the pleadings, and the

non-moving party receives the same protections as it would defending against a

motion brought under Rule 12(b)(6).  The general rule is that a complaint should

not be dismissed unless it appears beyond doubt that the plaintiff can prove no

set of facts in support of his claim which would entitle him to relief."  Osborn v.

United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990) (citations omitted).

### b.      Applicable Statute of Limitations

> Notwithstanding any other provision of law, a claim arising under
> Federal law seeking judicial review of a permit, license, or approval
> issued by a Federal agency for a highway or public transportation
> capital project shall be barred unless it is filed within 180 days after
> publication of a notice in the Federal Register announcing that the
> permit, license, or approval is final pursuant to the law under which
> the agency action is taken, unless a shorter time is specified in the
> Federal law pursuant to which judicial review is allowed.  Nothing
> in this subsection shall create a right to judicial review or place any
> limit on filing a claim that a person has violated the terms of a
> permit, license, or approval.

23 U.S.C. § 139(l)(1).  Under the statute, Sierra Club was required to file its

Complaint within 180 days of the FHWA's publication of final agency action – by

Monday, June 4, 2007.  Instead, Sierra Club filed its Complaint on Tuesday, June

5, 2007, one day before the deadline stated in the notice itself.  Defendants argue

that Sierra Club did not file its Complaint within 180 days of the publication of

the notice of the FHWA's final agency action, so this case is barred.  Sierra Club

asserts that equitable tolling and equitable estoppel should be applied to save its

claims.

The Court must first determine whether this particular statute of

limitations is subject to equitable modification.  If so, the Court must then

determine if the facts alleged can support a claim of equitable modification.

## 2.    Whether the Statute Is Subject to Equitable Modification

### a.    Standard

The Supreme Court set forth the general rule regarding the applicability of equitable tolling to statutes of limitations for claims against the government in Irwin v. Department of Veterans Affairs: "[T]he same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States.  Congress, of course, may provide otherwise if it wishes to do so."  498 U.S. 89, 95-96 (1990).  Although Irwin's general rule appears to allude to a possible requirement of a private analogue before the presumption applies, the Supreme Court has clarified that a "readily identifiable private-litigation equivalent" or "precise private analogue" is not required before equitable modification can be applied.  Scarborough v. Principi, 541 U.S. 401, 422 (2004).

Irwin's rebuttable presumption of the availability of equitable tolling can be rebutted in two main ways: by "[s]pecific statutory language," or by "a definitive earlier interpretation of the statute."  John R. Sand & Gravel Co. v. United States, 128 S. Ct. 750, 756 (2008).

19

Even in the absence of an explicit bar, congressional intent to bar equitable tolling can be found in a statute's "detail, its technical language, the iteration of the limitations in both procedural and substantive forms, and the explicit listing of exceptions." United States v. Brockamp, 519 U.S. 347, 352 (1997) (addressing the statutory limitations period for filing tax refund claims with the IRS).

The fact that a statute of limitations is construed to be jurisdictional, does not foreclose the availability equitable tolling because "there is no inconsistency between viewing compliance with the statute of limitations as a jurisdictional prerequisite and applying the rule of equitable tolling." Ingram v. United States, 443 F.3d 956, 961 (8th Cir. 2006) (citations omitted).

Finally, the Court concludes that Bowles v. Russell, 127 S. Ct. 2360 (2007), cited by Defendants, is not relevant.  The majority opinion in Bowles does not cite to Irwin at all.  Additionally, Bowles addresses the time period for filing an appeal, not a statute of limitations.  The Supreme Court has long held that the appeals period is mandatory and cannot not be enlarged.  Bowles, 127 S. Ct. at 2363.

### b.    Analysis

The Court holds that equitable modification is available for the statute of

limitations set forth in § 139(l)(1).  Under <u>Irwin</u>, <u>Scarborough</u>, and <u>John R.</u>, a

presumption in favor of the availability of equitable tolling applies and no

private analogue is required.  The Court begins its analysis with that

presumption.

There is no language in § 139(l)(1) that suggests that Congress intended to

foreclose the availability of equitable tolling.  In <u>Irwin</u>, the Supreme Court

addressed "shall be barred" language, like the "will be barred" language in

§ 139(l)(1), and stated that although "[a]n argument can undoubtedly be made

that the [shall be barred] language is more stringent [than the statute at issue in

<u>Irwin</u>,] . . . we are not persuaded that the difference between them is enough to

manifest a different congressional intent with respect to the availability of

equitable tolling."  <u>Irwin</u>, 498 U.S. at 95.  Therefore, the Supreme Court expressed

that the "shall be barred" language does not indicate Congress's intent that a

statute should not conform to the presumption that it allows equitable tolling

against the government.

The Court further notes that <u>Irwin</u> had been binding law for fifteen years

when Congress enacted the statute at issue in this case, § 139(l)(1), without

stating that tolling would be unavailable.  <u>See</u> <u>Young v. United States</u>, 535 U.S.

21

43, 49-50 (2002) ("It is hornbook law that limitations periods are customarily

subject to equitable tolling, unless tolling would be inconsistent with the text of

the relevant statute.  Congress must be presumed to draft limitations periods in

light of this background principle.") (citing, e.g., Irwin, 498 U.S. at 95) (other

citations omitted).

In this case, neither of the two exceptions to the rebuttable presumption in

favor of tolling mentioned in John R. exist here.  There is no specific statutory

language in § 139(l)(1) to rebut the presumption and the Supreme Court has not

provided a previous interpretation of the statute holding that tolling could not

apply.  Unlike the tax statute at issue in Brockamp, there are no indications that

Congress intended to bar the possibility of equitable modification of § 139(l)(1).

Section 139(l)(1) does not contain technical language; it does not reiterate the

limitation in both procedural and substantive forms; and it does not explicitly list

exceptions to the 180-limit.  It is not the type of complex statute, such as the tax

code, that would suggest tolling does not apply.   For all these reasons, the Court

concludes that § 139(l)(1) permits equitable tolling.

### 3.      Whether the Facts Support Equitable Modification

Because the Court concludes that § 139(l)(1) does permit equitable

modification, it must next determine whether the circumstances in this case

support the application equitable tolling or equitable estoppel.  Sierra Club

asserts that it is entitled to equitable tolling because it complied with the FHWA's

notice that legal challenges could be filed on or before June 6, 2007, by filing suit

on June 5, 2007.

### a.      Standard for Equitable Tolling

"To equitably toll a statute of limitations, the plaintiff must demonstrate

(1) timely notice, (2) lack of prejudice to the defendant, and (3) reasonable,

good-faith conduct by the plaintiff."  Pecoraro v. Diocese of Rapid City, 435 F.3d

870, 875 (8th Cir. 2006) (citation omitted).  "[T]he remedy of equitable tolling

traditionally is reserved for circumstances truly beyond the control of the

plaintiff, and should be applied where a party acts diligently, only to find himself

caught up in an arcane procedural snare."  Id. (citations omitted).  Equitable

tolling may apply when "a claimant has received inadequate notice, . . . [or]

where affirmative misconduct on the part of the defendant lulled the plaintiff

into inaction."  Warren v. Dept. of Army, 867 F.2d 1156, 1159-60 (8th Cir. 1989)

(quoting Baldwin County Welcome Ctr. v. Brown, 466 U.S. 147, 151 (1984)).

### b.      FHWA's Conduct

The Court concludes that Sierra Club's FHWA claims should be equitably tolled because the FHWA, through its publication of a misleading Federal Register notice, lulled Sierra Club into inaction.  See also Schlueter v. Anheuser-Busch, Inc., 132 F.3d 455, 458-59, 459 n.4 (8th Cir. 1998) (noting that "when an agency misleads a complainant as to certain specific pleading requirements, a claimant's failure to adhere to those requirements may be excusable, and thus, equitable tolling may apply" and holding that the EEOC's mistaken beliefs regarding the date by which plaintiff's claim was to be filed, which were communicated to plaintiff, justified equitable tolling); Anderson v. Unisys Corp., 47 F.3d 302, 306-07 (8th Cir. 1995) (noting that "when an administrative agency misleads a complainant, particularly one who is without the benefit of counsel, equitable tolling may be justified") (footnote and citations omitted).

In this case, even if the FHWA simply made a mistake in publishing the incorrect date, it had a federally-mandated duty to review this Federal Register Notice and ensure that any errors were corrected.  1 C.F.R. § 18.15(b) ("The issuing agency shall review published documents and notify the Officer of the Federal Register of printing errors found in published documents.")  When the

24

agency who made the misrepresentation is itself the defendant, it would be especially inequitable to allow the FHWA to profit from its own mistake.

### c.      Sierra Club's Due Diligence

Defendants assert that Sierra Club had timely notice of the deadline because the Complaint recites that the FHWA published the notice on December 5, 2006.  (Compl. ¶ 49.)  They claim Sierra Club has offered no allegation to support its due diligence or to demonstrate that the late filing was due to circumstances outside of its control.  They conclude that Sierra Club was aware of the existence of any claim and of the applicable statute of limitations, because the ROD mentions the 180-day limit and the correct statute and the Complaint recounts the 180-day statute of limitations and states that it commenced on December 5, 2006.  (Id.)  However, the Court notes that the Complaint also quotes the notice to conclude that the claim had to have been filed on or before June 6, 2007.  (Id.)  Sierra Club then alleges that, because its Complaint was filed on or before June 6, 2007, as required by the FHWA notice, the statute of limitations was satisfied.  (Id. ¶ 50.)

The Court concludes that the Sierra Club acted reasonably and in good faith by filing its lawsuit "on or before June 6, 2007," as directed by the FHWA.

25

See United States v. $39,480.00 in U.S. Currency, 190 F. Supp. 2d 929, 932 (W.D. Tex. 2002) (applying equitable tolling to Government's civil forfeiture claim where "the Government's good faith reliance on the July 27 date-stamp caused it to miss the filing deadline by one day" and "[t]he Government made every effort to comply with both the spirit and letter of the law and was clearly not attempting to frustrate the purpose of the statutory deadline").  Here, Sierra Club filed its Complaint **before** the deadline promulgated by the FHWA and only missed the actual statutory deadline by one day.  The Court notes that the FHWA, itself, clearly had difficulty calculating the correct date and published and failed to correct that incorrect date.

### d.     Prejudice

The Court concludes that the FHWA would not be prejudiced by tolling because it was expecting complaints to be filed on or before June 6, 2007, as it explicitly stated in the notice.  Additionally, the Court cannot conceive of how a one-day delay could cause prejudice in this case.

### e.     Conclusion

The Court concludes that equitable tolling applies in this matter.  The FHWA itself caused the delay by noticing the incorrect date for filing; Sierra Club

26

diligently filed its Complaint before the deadline promulgated by the FHWA,

and the one-day delay can hardly be said to prejudice the FHWA, particularly

when the filing came before the deadline the FHWA announced.  Defendants'

motion to dismiss Sierra Club's claims against the FHWA is denied.

### C.    Ripeness of Claims Against the NPS

#### 1.    Introduction

Defendants assert that Sierra Club's claims against the NPS are not ripe.

Sierra Club claims that all of the claims are ripe.  Alternatively, Sierra Club

contends that if Counts I, II, IV, and V are unripe, Count III is still ripe for review.

#### 2.    Standard of Review

Defendants' ripeness challenge to the NPS claims present a factual attack

on subject matter jurisdiction.  "In a factual attack, the court considers matters

outside the pleadings, and the non-moving party does not have the benefit of

12(b)(6) safeguards."  Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir.

1990) (citations omitted).

The Court's jurisdiction under the APA is confined to "final" agency

action.  5 U.S.C. § 704; Sierra Club v. U.S. Army Corps of Engineers, 446 F.3d 808,

813 (8th Cir. 2006).  An agency's action is "final" for purposes of the APA if 1) the

action "mark[s] the consummation of the agency's decisionmaking process;" and

2) "the action [is] one by which rights or obligations have been determined or

from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 177-78

(1997) (citations omitted).  When determining whether a claim is ripe, courts

examine "the state of the case at the time of review, not at the time of filing."

Pub. Water Supply Dist. No. 8 v. City of Kearney, 401 F.3d 930, 932 (8th Cir. 2005)

(citations omitted).

> A broad agency program is not a final agency action within the
> meaning of 5 U.S.C. § 704.  Nor is an agency report that serves more
> like a tentative recommendation than a final and binding
> determination.  But if the agency has issued a definitive statement of
> its position, determining the rights and obligations of the parties,
> that action is final for purposes of judicial review despite the
> possibility of further proceedings in the agency to resolve subsidiary
> issues.

Sierra Club, 446 F.3d at 813 (citations omitted).

### 3.    Ripeness of Counts I, II, IV, and V

Defendants assert that Counts I, II, IV, and V against the NPS fail because

Sierra Club has not challenged any final agency action and the claims are not ripe

for judicial review.

### a.    Whether the 2005 Section 7 Evaluation Was the Consummation of the NPS's Decision-Making Process

28

Defendants argue that the 2005 Section 7(a) Evaluation is not final because it stated that it "will be reexamined in light of the outcome of the Visual Quality Planning Process." (2005 Section 7 Evaluation at 51.) Additionally, the NPS stated that it would reevaluate the project "[i]f the scope of the project or mitigation package should change substantially." (Id.)

The 2005 Section 7 determination specified that "[t]he NPS will provide comments during the review period for the public notice that application has been made for Section 10/404 permits for the preferred crossing from the U.S. Army Corps of Engineers." (2005 Section 7 Evaluation at 51.) Because the Corps has not yet published public notice of a Section 10/404 permit application related to the proposed project, Defendants claim that the review period during which the NPS will provide final Section 7 comments and determination has not yet commenced. Defendants claim that the 2005 Section 7(a) Evaluation has no legal consequences until it is finalized in the NPS's comments to the Corps on the project proposers' Section 404 permit application. At that time, the NPS's determination regarding the project's "direct and adverse effect" will legally and practically affect whether the Corps can move forward with its Section 404 permit.

29

Although the 2005 Section 7 Evaluation was purportedly a "draft," it represented the consummation of the agency's decision-making process. In the Evaluation, the NPS determined that the Proposed Bridge, "when taken along with its mitigation package would not have a direct and adverse effect on the scenic and recreational values" of the Lower St. Croix, so long as the mitigation package was incorporated into the Proposed Bridge project. (2005 Section 7 Evaluation at 51.) The NPS issued no further evaluation before the FHWA's release of the ROD. Because the ROD authorized a "water resources project" within the meaning of Section 7, 16 U.S.C. § 1278(a), the 2005 Section 7 Evaluation was, for all practical purposes, the culmination of the NPS's decision-making process.

All of the contingencies listed by Defendants have occurred. First, the 2005 Evaluation provided that it would "be reexamined in light of the outcome of the Visual Quality Planning Process." (2005 Section 7 Evaluation at 51.) That process ended more than one year ago. (Pl. Ex. D.) Second, the 2005 Evaluation stated the NPS's request for assurances that the mitigation measures would be implemented. (2005 Section 7 Evaluation at 51-52.) This contingency was resolved in April 2006, when the NPS, FHWA, and several state agencies entered

into a Memorandum of Understanding for the Implementation of Riverway

Mitigation Items.  (Pl. Ex. E)  Because the Visual Quality Planning Process has

been completed and the mitigation package has been incorporated into the

Proposed Bridge project, there are no remaining contingencies and the NPS's

"draft determination will stand."  (2005 Section 7 Evaluation at 52.)  The "draft"

Section 7 Evaluation represents the NPS's final word on whether the Proposed

Bridge violates the WSRA.

    The fact that the NPS will need to reevaluate the project if, due to some

unexpected event, the scope of the project or mitigation package changes

substantially does not mean that the 2005 Section 7 Evaluation lacks finality.  See,

e.g., Am. Petroleum Inst. v. EPA, 906 F.2d 729, 739-40 (D.C. Cir. 1990) ("[A]n

agency _always_ retains the power to revise a final rule through additional

rulemaking.  If the possibility of unforeseen amendments were sufficient to

render an otherwise fit challenge unripe, review could be deterred indefinitely.").

    Even if there is a minor contingency that has not yet occurred, that would

not affect the legal significance of the 2005 Section 7 Evaluation.  When "the

agency has issued a definitive statement of its position, determining the rights

and obligations of the parties, that action is final for purposes of judicial review

31

despite the possibility of further proceedings in the agency to resolve subsidiary

issues." Sierra Club v. U.S. Army Corps of Engineers, 446 F.3d 808, 813 (8th Cir.

2006) (citation omitted).

### b.   Legal Consequences of the NPS's Actions

Defendants assert that no legal consequences will flow from the NPS's

Section 7 draft determination until it becomes final in the context of the Section

404 permit process.

Had the NPS issued a negative Section 7 evaluation, as it did for the 1995

Proposal, then no further steps could be taken toward construction of the bridge.

Instead, the FHWA relied on the NPS's 2005 Section 7 Evaluation in issuing the

ROD in November 2006.  The ROD indisputably has consequences because the

state DOTs can now begin implementation of the Proposed Bridge project.  (Pl.

Ex. H.)  The legal consequences of the 2005 Section 7 Evaluation demonstrate its

finality for purposes of judicial review.  See Nat'l Wildlife Fed'n v. Harvey, 440 F.

Supp. 2d 940, 947 (E.D. Ark. 2006) (finding that "conditional concurrence letter"

by Fish and Wildlife Service was final agency action because "letter allowed

additional construction and represented an irreversible commitment of agency

resources").

The Court rejects Defendants' assertion that the NPS need not issue a

Section 7 determination until the Corps considers whether to issue a permit

under Section 404 of the Clean Water Act.  Section 7 of the WSRA's purpose is to

prevent the construction of water resources projects "that would have a direct

and adverse effect" on the outstandingly remarkable values of a wild and scenic

river.  16 U.S.C. § 1278(a).  If, as Defendants maintain, the NPS's evaluation could

be delayed until the 404 permitting process, then the state DOT's could proceed

with onshore construction activities that could seriously harm the Lower St.

Croix.

For the WSRA to have any teeth, the NPS's evaluation must precede the

ROD.  Now that the contingencies identified in the 2005 Section 7 Evaluation

have come to pass, the document is final.  Thus, the NPS's actions "alter[ed] the

legal regime to which the action agency [the FHWA] is subject."  Bennett, 520

U.S. at 178.

### c.      Traditional Ripeness Analysis

The NPS's actions are also ripe when analyzed under the standards of

Ohio Forestry Ass'n, Inc. v. Sierra Club:

>      In deciding whether an agency's decision is, or is not, ripe for

33

judicial review, the Court has examined both the fitness of the issues
for judicial decision and the hardship to the parties of withholding
court consideration.  To do so in this case, we must consider: (1)
whether delayed review would cause hardship to the plaintiffs; (2)
whether judicial intervention would inappropriately interfere with
further administrative action; and (3) whether the courts would
benefit from further factual development of the issues presented.

523 U.S. 726, 733 (1998) (citation omitted).

### i.      Whether Delayed Review Would Cause Hardship to the Plaintiffs

A delay would cause serious hardship to Sierra Club.  Ten years ago, Sierra

Club successfully challenged the construction of a bridge that, according to Sierra

Club, would have destroyed the Lower St. Croix's scenic and recreational

qualities, but the FHWA and state DOTs have now proposed a bridge that Sierra

Club claims is almost identical.  The NPS's 2005 Section 7 Evaluation cleared the

way for the FHWA to issue a ROD, which allows the state DOTs to begin

implementing significant portions of the project.  Sierra Club argues that if it

must wait until the end of the Section 404 permitting process before filing suit,

the Lower St. Croix could be irreparably damaged before judicial review even

begins.  Cf. E. Conn. Citizens Action Group v. Dole, 638 F. Supp. 1297, 1299 n.2

(D. Conn. 1986) (holding agency decision not ripe when there was

uncontroverted evidence that Connecticut Department of Transportation would

not begin any construction activities until Section 404 permit was obtained), aff'd

804 F.2d 804 (2d Cir. 1986).

> ### ii.   Whether Judicial Intervention Would Inappropriately Interfere with Further Administrative Action

The Court concludes that judicial review would not inappropriately

interfere with administrative action because the FHWA has already issued its

ROD and the Proposed Bridge has been authorized.  See S. C. Wildlife Fed'n, 485

F. Supp. 2d at 671 (finding ripeness for review of final EIS for federal highway

project "because the primary policy-setting documents have already been

produced").  With the contingencies resolved, the 2005 Section 7 Evaluation is

now final.  The fact that some additional permits may be needed for parts of the

project does not obviate the finality of the ROD.  Because the FHWA has already

signed off on the project, the NPS no longer has "an opportunity to correct its

own mistakes."  Ohio Forestry, 523 U.S. at 735 (citation omitted).

> ### iii.   Whether the Court Would Benefit from Further Factual Development of the Issues Presented

Undoubtedly, there would be even more information before the Court if

the Court waited to act until the Corps completed its assessment of the project's

effects on wild and scenic river values as part of its Section 404 permit evaluation.

However, the prospect of additional information does not defeat ripeness in this

case.  The Court would not greatly benefit from further development of the

factual record because Sierra Club is asking the Court to review a site-specific

project that the FHWA has already approved.

Counts I, II, IV, and V against the NPS are all ripe for judicial review

because the NPS has issued a final agency action.  The Court has found ripeness

under both the Bennett test and the Ohio Forestry test.

### 4.      Ripeness of Count III

Count III, which challenges the NPS's unlawful withholding or

unreasonable delay of an agency action, is moot given the Court's conclusion that

the NPS has, in fact, issued a final agency action.  Therefore, the Court dismisses

Count III.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.      Defendants' Motion to Dismiss for Lack of Jurisdiction  [Docket No.

16] is **DENIED**.

2.      Count III is **DISMISSED**.


Dated:   May 15, 2008                              s/Michael J. Davis
                                                   Judge Michael J. Davis
                                                   United States District Court