# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

SIERRA CLUB NORTH STAR
CHAPTER,

        Plaintiff,

v.

RAY LaHOOD, Secretary of
Transportation; VICTOR MENDEZ,
Federal Highway Administrator;
KEN SALAZAR,
Secretary of the Interior; and
JONATHAN B. JARVIS, Director of
the National Park Service;

        Defendants,

and

MINNESOTA DEPARTMENT OF
TRANSPORTATION and WISCONSIN
DEPARTMENT OF TRANSPORTATION,

        Intervenors.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 07-2593 (MJD/SRN)

_____

Brian B. O'Neill, Elizabeth H. Schmiesing, Michelle E. Weinberg, and Richard A.
Duncan, Faegre & Benson, LLP; and Michael C. Soules, Environmental Law &
Policy Center, Counsel for Plaintiff.

Friedrich A. P. Siekert, Assistant United States Attorney, Counsel for Defendants Ray LaHood, Secretary of Transportation; Victor Mendez[1], Federal Highway Administrator; Ken Salazar, Secretary of the Interior; and Jonathan B. Jarvis[2], Director of the National Park Service.

Patrick Whiting, Minnesota Attorney General's Office, Counsel for Defendant Minnesota Department of Transportation.

Richard Briles Moriarty, Wisconsin Department of Justice, Counsel for Wisconsin Department of Transportation.

_____

## I.    INTRODUCTION

This matter is before the Court on Federal Defendants' Motion for Summary Judgment [Docket No. 70], Motion for Summary Judgment of Intervenor Wisconsin Department of Transportation [Docket No. 73], Plaintiff's Motion for Summary Judgment [Docket No. 78], and Intervenor State of Minnesota Department of Transportation's Motion for Summary Judgment [Docket No. 87].  The Court heard oral argument on September 14, 2009.

## II.    SUMMARY OF THE COURT'S OPINION

_____

[1]Pursuant to Federal Rule of Civil Procedure 25(d), Victor Mendez is automatically substituted for former Acting Deputy Administrator Jeffrey F. Paniati.

[2]Pursuant to Federal Rule of Civil Procedure 25(d), Jonathan B. Jarvis is automatically substituted for former Acting National Park Service Director Daniel N. Wenk.

The Court concludes that the National Park Service's 2005 Section 7 Evaluation was arbitrary and capricious because the National Park Service ignored its contrary position in the 1996 Section 7 Evaluation. The 2005 Section 7 Evaluation is vacated.

In 1996, the National Park Service concluded that a "massive" proposed four-lane bridge connecting TH 36 and STH 64 across the Lower St. Croix approximately one mile south of the Stillwater Lift Bridge would directly and adversely affect the Lower St. Croix's outstandingly remarkable scenic and recreational values with its "dramatic and disruptive" visual impact. This Section 7 Evaluation prevented federal authorization for the 1995 proposed bridge.

In 2005, the National Park Service performed a Section 7 Evaluation for a longer and taller proposed four-lane bridge connecting TH 36 and STH 64 across the Lower St. Croix approximately one mile south of the Stillwater Lift Bridge and again characterized the bridge's visual effect as "dramatic and disruptive." The National Park Service then inexplicably concluded that the new bridge would **not** directly and adversely affect the Lower St. Croix's outstandingly remarkable scenic and recreational values. In the 2005 Section 7 Evaluation, the

National Park Service wholly failed to mention, let alone distinguish, the 1995 proposed bridge or the contrary 1996 Section 7 Evaluation.

While there are some differences between the two bridges, common sense provides that they are generally similar – in purpose, location, and physical characteristics. The new proposed bridge includes minimization measures, which the National Park Service concluded could not reduce the visual impact of the proposed bridge to an acceptable level. It also includes a handful of new mitigation measures aimed at offsetting the bridge's visual impact. However, the National Park Service fails to explain how combining a group of apparently ineffective measures, all of which relate to shoreline actions, can create an effective mitigation package, when, in 1996, it concluded that no available mitigation measures could significantly reduce the negative visual impact of a similar bridge. In 1996, the National Park Service concluded that the visual impacts of shoreline development were simply "not comparable" to the visual impacts of the bridge. Yet, in 2005, the National Park Service abruptly changed course and concluded that visual mitigation based solely on shoreline actions, when combined with minimization measures, could adequately offset the bridge's negative visual impact.

In the 1996 Section 7 Evaluation, the National Park Service's main concern for visual impact was based on the massiveness of a bridge spanning the Lower St. Croix in that basic location – a concern it concluded could not be effectively mitigated or minimized. In the 2005 Section 7 Evaluation, the National Park Service failed to explain why that concern has evaporated.

A federal agency may reevaluate previous determinations and change its mind, but the agency must explain its reasons for changing its position. Because the 2005 Section 7 Evaluation completely omitted reference to the 1995 proposed bridge and the 1996 Section 7 Evaluation, the Court must conclude that the National Park Service gave no thought to its change in position. The National Park Service's failure to acknowledge its previous contrary position, let alone explain why, in its opinion, a change is justified, is the hallmark of an arbitrary and capricious decision.

## III.    BACKGROUND

### A.    Statutory Framework

#### 1.    National Environmental Policy Act ("NEPA")

The NEPA is a procedural statute that requires federal agencies to prepare a detailed environmental impact statement ("EIS") for "major Federal actions

significantly affecting the quality of the human environment."  42 U.S.C.

§ 4332(2)(C).  An agency's EIS should "[r]igorously explore and objectively

evaluate all reasonable alternatives," but need only "briefly discuss" the reasons

why other alternatives were eliminated from more detailed study.  40 C.F.R.

§ 1502.14.  Additionally, an EIS should identify the direct, indirect, and

cumulative impacts of each alternative that is studied and consider mitigation

measures to reduce any impacts on the environment.  40 C.F.R. §§ 1502.14,

1502.16, 1508.7.

"NEPA mandates that a federal agency take a hard look at the

environmental consequences of a major federal action before taking that action."

Mid States Coalition for Progress v. Surface Transp. Bd., 345 F.3d 520, 533 (8th

Cir. 2003) (citation and internal quotations omitted).

### 2.      Section 4(f) of the Department of Transportation Act of 1966

Generally, under Section 4(f),

the Secretary may approve a transportation program or project . . .
requiring the use of publicly owned land of a public park, recreation
area, or wildlife and waterfowl refuge of national, State, or local
significance, or land of an historic site of national, State, or local
significance . . . only if–

(1) there is no prudent and feasible alternative to using that land;

and

> (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303(c).

Federal Highway Administration ("FHWA") regulations require that, for projects subject to the section 4(f) requirement, the 4(f) evaluation shall document why there is no "feasible and prudent" alternative and the planning measures taken to "minimize harm" to the property resulting from the use. 49 C.F.R. § 266.19(b)(4). Additionally, a final EIS or Finding of No Significant Impact ("FONSI") should document compliance with applicable requirements, including section 4(f). 23 C.F.R. § 771.133.

### 3.    Wild and Scenic Rivers Act ("WSRA")

The WSRA was enacted in 1968 to preserve the free-flowing condition of certain rivers. 16 U.S.C. § 1271. The WSRA created a national Wild and Scenic Rivers System and developed a process so that other rivers with "outstandingly remarkable scenic, recreational, geologic, fish and wildlife, historic, cultural or other similar values, shall be preserved in free-flowing condition." Id. The WSRA identifies the rivers in the System, sets forth a procedure by which

additional rivers may be added, and provides guidance on how the designated rivers should be managed.  16 U.S.C. §§ 1271-87.

Under Section 10(a), the administering agency must manage each designated river segment "in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values."  16 U.S.C. § 1281(a).

The upper stretch of the St. Croix River was one of the rivers originally included in the Wild and Scenic River System.  16 U.S.C. § 1274(a)(6).  The Lower St. Croix was later added.  16 U.S.C. § 1274(a)(9).

Under the WSRA, rivers are classified as "wild," "scenic," or "recreational."  16 U.S.C. § 1273(b).  Recreational rivers are the most developed category and are "[t]hose rivers or sections of rivers that are readily accessible by road or railroad, that may have some development along their shorelines, and that may have undergone some impoundment or diversion in the past." § 1273(b)(3).  The uppermost 10.3 miles of the Lower St. Croix are scenic, while the downstream 42 miles of the Lower St. Croix, including the portion at issue here, are classified as recreational.  (2005 Section 7 Evaluation, National Park

Service Administrative Record ("NPS") 467.)

Section 7 of the WSRA provides that "no department or agency of the United States shall assist by loan, grant, license, or otherwise in the construction of any water resources project that would have a direct and adverse effect on the values for which such river was established, as determined by the Secretary charged with its administration." 16 U.S.C. § 1278(a). Thus, Section 7 requires the National Park Service ("NPS") to evaluate whether a "water resources project . . . would have a direct and adverse effect" on a river's values. When a water resources project is found to have a "direct and adverse effect" on a wild and scenic river, the project cannot be authorized or funded absent congressional intervention. Id.

### 4. Organic Act and General Authorities Act

The National Park Service Organic Act of 1916 ("Organic Act") established NPS and created its authority over the maintenance of national parks. 16 U.S.C. §§ 1 – 18f-3. The Organic Act provides that NPS must "regulate the use" of national parks by means that conform to their "fundamental purpose," namely:

> to conserve the scenery and the natural and historic objects and the
> wild life therein and to provide for the enjoyment of the same in
> such manner and by such means as will leave them unimpaired for

the enjoyment of future generations.

16 U.S.C. § 1.

Congress later passed an amendment to the Organic Act, known as the

General Authorities Act, which provides:

> The authorization of activities shall be construed and the protection,
> management, and administration of these areas shall be conducted
> in light of the high public value and integrity of the National Park
> System and shall not be exercised in derogation of the values and
> purposes for which these various areas have been established, except
> as may have been or shall be directly and specifically provided by
> Congress.

16 U.S.C. § 1a-1.  NPS has construed the "derogation" standard in the General

Authorities Act as a reiteration of the non-impairment standard set forth in the

Organic Act – that is, a duty to prohibit the impairment of the integrity of park

resources and values.  NPS Management Policies § 1.4.2 (2006); Record of

Decision, 66 Fed. Reg. 56848, 56850 (Nov. 13, 2001).

Under NPS policy, NPS must "examine the duration, severity, and

magnitude of the impact; the resources and values affected; and direct, indirect,

and cumulative effects of the action."  66 Fed. Reg. 56848, 56850.   "If there would

be an impairment, the action may not be approved."  NPS Management Policies

§1.4.7 (2006).

5        **Comprehensive Management Plan**

The WSRA requires governing agencies to develop comprehensive management plans ("CMPs") to provide for the protection of wild and scenic rivers' values:

> For rivers designated on or after January 1, 1986, the Federal agency charged with the administration of each component of the National Wild and Scenic Rivers System shall prepare a comprehensive management plan for such river segment to provide for the protection of the river values. The plan shall address resource protection, development of lands and facilities, user capacities, and other management practices necessary or desirable to achieve the purposes of this chapter. The plan shall be coordinated with and may be incorporated into resource management planning for affected adjacent Federal lands. The plan shall be prepared, after consultation with State and local governments and the interested public within 3 full fiscal years after the date of designation. Notice of the completion and availability of such plans shall be published in the Federal Register.

16 U.S.C. § 1274(d)(1). "Management plans for any such component [of a wild and scenic river] may establish varying degrees of intensity for its protection and development, based on the special attributes of the area." 16 U.S.C. § 1281(a).

Minnesota, Wisconsin, and NPS entered into a new CMP for the Lower St. Croix in 2001. Record of Decision, 66 Fed. Reg. 56,848 (Nov. 13, 2001).

**B.        Factual Background**

## 1. The Parties and the River

Plaintiff is the Sierra Club North Star Chapter ("Sierra Club").  The Federal Defendants are Ray LaHood, Secretary of Transportation; Victor Mendez, the Federal Highway Administrator; Ken Salazar, Secretary of the Interior; and Jonathan B. Jarvis, Director of the NPS.  Intervenor-Defendants are the Minnesota Department of Transportation ("MnDOT") and the Wisconsin Department of Transportation ("WisDOT").  ("Defendants" shall collectively refer to the Federal Defendants and the Intervenor-Defendants.)  This case relates to a proposed bridge that would cross the Lower St. Croix River near Oak Park Heights, Minnesota.

The Lower St. Croix runs along the Minnesota-Wisconsin border.  The Lower St. Croix has many wildlife species, including federally-protected bald eagles and peregrine falcons.  It contains one of the world's richest freshwater mussel communities and is home to forty species of mussels, including two federally-endangered species: the Higgins' eye pearlymussel and the winged mapleleaf mussel.

Currently, ten bridges traverse the St. Croix, including the Stillwater Lift Bridge ("Lift Bridge"), between Stillwater, Minnesota, and Houlton, Wisconsin.

<u>Sierra Club N. Star Chapter v. Peña</u>, 1 F. Supp. 2d 971, 974 (D. Minn. 1998). The Lift Bridge connects Minnesota Trunk Highway 36 ("TH 36") to Wisconsin State Trunk Highway 64 ("STH 64"). <u>Id.</u>

## 2. 1995 Bridge Proposal

FHWA, MnDOT, and WisDOT have long sought to construct a new bridge over the river. These efforts resulted in a final EIS in April 1995, and a record of that decision in July 1995. <u>Sierra Club N. Star Chapter</u>, 1 F. Supp. 2d at 974.

The highway departments' preferred alternative was a four-lane bridge that would cross the river about one mile south of Stillwater, Minnesota ("1995 Proposal"). The total length of the bridge would be 6 miles; it would be 104 feet wide with a total height of 72 feet on the Minnesota side of the river and 128 feet on the Wisconsin side of the river; and 8 of the 25 bridge piers would be located in the riverbed. (Section 7(a) Evaluation; Wild and Scenic Rivers Act; Proposed New St. Croix River Crossing ("1996 Section 7 Evaluation"), NPS 386-87.)

Because the 1995 Proposal would have required extensive dredge and fill, the Clean Water Act required the transportation agencies to obtain a "dredge and fill" permit from the Corps of Engineers. 33 U.S.C. § 1344; <u>Sierra Club N. Star Chapter</u>, 1 F. Supp. 2d at 975.

In June 1996, the Sierra Club and another conservation group filed suit to enjoin construction of the project. Among other claims, Sierra Club alleged that the Department of the Interior failed to discharge its obligation under the WSRA to analyze whether the 1995 Proposal satisfied the standards of Section 7 of the WSRA. Sierra Club N. Star Chapter, 1 F. Supp. 2d at 975.

After Sierra Club filed suit, NPS conducted the necessary Section 7 evaluation on the 1995 Proposal. FHWA suspended its authorization of the 1995 Proposal pending the outcome of the Section 7 process. Id.

On December 27, 1996, NPS issued its WSRA Section 7 evaluation, which concluded that the 1995 Proposal would have a direct and adverse impact on the Lower St. Croix's scenic and recreational values. (See 1996 Section 7 Evaluation.) The evaluation particularly criticized the potential visual impact of the proposed bridge. (NPS 435-36.) In particular, NPS found, "Placing a massive bridge where there previously was not one results in a fundamental change in the scenic qualities that existed in this portion of the Riverway at the time of designation." (NPS 435.) It opined, "The severity and magnitude of the visual impacts related to the proposed project are so great that they cannot be significantly reduced by the available mitigation measures." (NPS 436.) NPS also concluded that the 1995

Proposal would negatively affect the Lower St. Croix's recreational values and its mussel populations, which "should be protected to the same extent as the outstandingly remarkable scenic and recreational values." (NPS 410.)

After the Section 7 evaluation was released, the federal government withdrew its authorization and financial support for the 1995 Proposal. In an effort to save the project, MnDOT and WisDOT ("state DOTs") intervened in Sierra Club's lawsuit and directly challenged the Section 7 evaluation.

On April 13, 1998, the Court rejected the state DOTs' claims and upheld the NPS determination. Peña, 1 F. Supp. 2d at 983.

### 3. Current Bridge Proposal

After the 1998 court decision, FHWA and the state DOTs began working to revive the project. During the process, FHWA and the state DOTs consulted a Stakeholders Group, which included Sierra Club. (FHWA 4094.) The Stakeholders Group was permitted to comment on the process but did not have decision-making authority. (Id.) In March 2004, FHWA and the state DOTs issued an Amended Final Scoping Decision Document identifying five build alternatives and one no-build alternative for the project. (FHWA 2906.) The alternatives were:

**Alternative A**, which involved renovating the existing Stillwater Lift Bridge and using a combination of transportation techniques, including mass transit and attempting to redirect more traffic to the I-94 river crossing.  (FHWA 2923.)

**Alternative B**, which was the 1995 Proposal.  This proposal included construction of a four-lane highway bridge with a bicycle/pedestrian trail approximately a mile south of the Lift Bridge.  (FHWA 2923.)

**Alternative B-1**, which eventually became the Proposed Bridge, included construction of a four-lane highway bridge slightly south of the 1995 Proposal.  (FHWA 2924, 9023.)  (A number of other variations on Alternatives B were also studied, including the option to convert the Lift Bridge into a pedestrian and bicycle bridge, the option to retain the Lift Bridge for limited vehicle use by banning large trucks, and the option to install park-and-ride facilities in Wisconsin and Minnesota.  (FHWA 2924.))

**Alternative C**, which included construction of a four-lane highway bridge three-quarters of a mile south of the Lift Bridge.  (FHWA 2924.)

**Alternative D**, which called for construction of a four-lane bridge less than half a mile south of the Lift Bridge on the Minnesota side and 160 feet

south on the Wisconsin side.  (FHWA 2925.)

**Alternative E**, which included construction of a two-lane bridge less than

half a mile south of the Lift Bridge on the Minnesota side and 200 feet

south of the Lift Bridge on the Wisconsin side.  The new bridge would

handle eastbound traffic and the converted Lift Bridge would handle

westbound traffic.  (FHWA 2926.)

In August 2004, FHWA and the state DOTs issued a supplemental draft

EIS ("SDEIS").  (FHWA 4019 et seq.)  Alternative A, the transit option, was not

studied because it did not meet the need and purpose of the project because it

would not alleviate congestion, would shift congestion to I-94, and would not

address reliability problems associated with the Lift Bridge.  (FHWA AR 2966-

67.)  Also, Alternative B was eliminated from further study because of the 1996

Section 7 Evaluation determination that it would have direct and adverse effects

on the outstandingly remarkable values of the Lower St. Croix.  (Id. 2967.)

Alternative B-1, with a different alignment, was instead considered.  (Id.)

Alternative B-1 contained two sub-alternatives: Alternative B-1a proposed

closing the Lift Bridge to vehicular traffic and converting it into a non-motorized

pathway, while Alternative B-1b would leave the Lift Bridge open to local traffic.

(FHWA 4132.)

In October 2005, NPS issued a draft Section 7 evaluation of the project. (Draft Section 7(a) Evaluation; Wild and Scenic Rivers Act; St. Croix River Crossing Project (October 2005) ("2005 Section 7 Evaluation"), NPS 462 et seq.) The 2005 Section 7 Evaluation studied the impact of Alternative B-1a on the Riverway.  (Id. at 468-78.)  NPS admitted that Alternative B-1a would have a direct adverse effect on the scenic and recreational values of the Lower St. Croix. (NPS 517-18.)  However, NPS concluded that, given the proposed mitigation package, the Proposed Bridge's adverse effect on the scenic and recreational values of the Lower St. Croix would be adequately offset.  (Id.)  The 2005 Section 7 Evaluation did not mention the 1996 Section 7 Evaluation.

In June 2006, when the transportation agencies released the Supplemental Final EIS ("SFEIS"), they chose Alternative B-1a as the Preferred Alternative. (FHWA 7791-92.)  This proposal ("Proposed Bridge") became the Selected Alternative when FHWA issued its November 2006 Record of Decision ("ROD"). (FHWA 9023.)

The Proposed Bridge would be located between TH 36 in Stillwater and Oak Park Heights, Minnesota, and STH 64 in St. Joseph, Wisconsin.  (NPS 464.)

## C.    Procedural Background

On June 5, 2007, Sierra Club filed a Complaint against Defendants in this

Court.  The Complaint alleges

Count I, Violations of WSRA and the [Administrative Procedure Act] ["]APA["] by NPS and FHWA based on the claim that the Proposed Bridge project creates a new transportation corridor without restoring the existing corridor to natural conditions in violation of the CMP;

Count II, Violations of the WSRA and the APA against NPS based on the claim that NPS's 2005 Section 7 Evaluation wrongly concluded that the Proposed Bridge project would not have a direct and adverse effect on the Lower St. Croix's scenic, recreational, wildlife, and other natural values;

Count III, Violations of the WSRA and the APA by NPS, in the alternative to Count II, based on the claim that if NPS's 2005 Section 7 Evaluation was not final agency action, NPS's failure to issue a Section 7 determination represents "agency action unlawfully withheld or unreasonably delayed;"

Count IV, Violations of the WSRA, Organic Act, General Authorities Act, and the APA by NPS based on the claim that NPS's approval of the Proposed Bridge is contrary to the non-degradation and non-impairment policies promulgated under those statutes;

Count V, Violations of the WSRA and the APA by NPS based on the claim that NPS's grant of a new right-of-way for the Proposed Bridge does not protect the qualities for which the Lower St. Croix was designated a wild and scenic river;

Count VI, Violations of the Transportation Act and the APA by

FHWA, based on the claim that FHWA violated Section 4(f) of the Transportation Act by approving the Proposed Bridge without adequately considering alternatives that could have avoided use of the Lower St. Croix Riverway and approving a project that does not minimize harm to the Riverway; and

Count VII, Violations of NEPA and the APA by FHWA based on the claim that FHWA violated the NEPA due to inadequacies in the EISs and ROD.

Defendants moved to dismiss this case based on lack of subject matter jurisdiction because 1) as to the claims against FHWA, Plaintiff failed to file its Complaint within the statutory 180-day limitations period; and 2) as to claims against NPS, the Complaint does not challenge a final agency action. On May 15, 2008, the Court granted in part and denied in part the motion to dismiss. Sierra Club North Star Chapter v. Peters, Civil No. 07-2593 (MJD/SRN), 2008 WL 2152199 (D. Minn. May 15, 2008). The Court dismissed Count III, but permitted the other Counts to remain.

On July 8, 2008, Magistrate Judge Nelson issued an Order, based on the parties' stipulation, permitting MnDOT and WisDOT to intervene as Defendants in this matter. [Docket No. 38]

Currently before the Court are motions for summary judgment by all parties.

## IV.   DISCUSSION

### A.   Summary Judgment Standard

#### 1.   General Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact.  Celotex, 477 U.S. at 323.  Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

#### 2.   APA Standard

Sierra Club's claims are all brought pursuant to the APA.  Under the APA, a court will set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation

for its action including a rational connection between the facts found and the choice made." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (citation and internal quotations omitted). Generally, an agency's action is arbitrary and capricious if it

> has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: We may not supply a reasoned basis for the agency's action that the agency itself has not given.

Id. (citation and internal quotations omitted). Also, a decision is arbitrary and capricious if the agency "fail[s] to apply the relevant statutory authority in making its decision." Sokol v. Kennedy, 210 F.3d 876, 878 (8th Cir. 2000).

**B.** **Whether NPS's 2005 Section 7 Evaluation Is Arbitrary and Capricious**

Sierra Club claims that the 2005 Section 7 Evaluation was unlawful for six main reasons: 1) by approving construction of the Proposed Bridge, NPS arbitrarily reversed its earlier position on the 1995 Proposal without explanation; 2) in the alternative, even if NPS did not arbitrarily reverse its position, NPS's mitigation conclusions are counter to the evidence in the record; 3) NPS failed to

consider the Proposed Bridge's impact on the mussel communities; 4) NPS's authorization of the project violated the Lower St. Croix CMP; 5) NPS failed to apply the "protect and enhance" requirement of Section 10(a) of the WSRA; and 6) NPS failed to consider whether the Proposed Bridge would violate the non-impairment requirement of the Organic Act and General Authorities Act.

### 1. Whether the 2005 Section 7 Evaluation Is Judicially Reviewable

The Court rejects defense claims that the Section 7 Evaluation is not judicially reviewable. As previously noted, under the APA, a court may set aside an agency action if that action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). However, APA review does not apply when "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). This "very narrow exception" applies when "statutes are drawn in such broad terms that in a given case there is no law to apply." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410 (1971) (citation omitted), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977).

"[T]here is a strong presumption that Congress intends judicial review of administrative action." Kenney v. Glickman, 96 F.3d 1118, 1124 (8th Cir. 1996)

(citation omitted).  There must be "clear and convincing evidence of Congress's intent to preclude judicial review."  Arkla Exploration Co. v. Texas Oil & Gas Corp., 734 F.2d 347, 354 (8th Cir. 1984) (citation omitted).

In this case, the Section 7 Evaluation is subject to APA review.  The relevant statutory test sets forth the applicable standard: NPS must decide whether a water resources project, such as the Proposed Bridge, "would have a direct and adverse effect on the values for which [the wild and scenic] river was established."  16 U.S.C. § 1278(a).  In this case, NPS is required to consider whether the Proposed Bridge would have a direct and adverse effect on the Riverway's scenic, recreational, and geologic values.  (See NPS 4, 14.)  This statutory requirement provides a meaningful standard of review.  Cf. Sokol v. Kennedy, 210 F.3d 876, 879 (8th Cir. 2000) (rejecting "the defendants' contention that the Wild and Scenic Rivers Act provided no meaningful standard for the selection of detailed boundaries," because Section 1281(a) "clearly set out" a duty to "identify and seek to protect" the river's outstandingly remarkable values).  See also Sierra Club North Star Chapter v. Peña, 1 F. Supp. 2d at 981-83 (reviewing 1996 Section 7 Evaluation under APA).

## 2.  Significance of the Lower St. Croix's State-Administered

## Designation

The parties assert various arguments regarding the Section 7 Evaluation that depend upon whether the portion of the Lower St. Croix at issue in this lawsuit – the lower section of the Lower St. Croix – is considered to be state-administered. Sierra Club argues that the relevant section of the Lower St Croix is not strictly a state-administered river. The Court disagrees. Therefore, the Court begins its discussion with an explanation of why the relevant section of the Lower St. Croix is a state-administered river under the WSRA.

### a.    Designation Process for the Lower St. Croix

A river can be added to the Wild and Scenic Rivers System in one of two ways: through an Act of Congress or through a state application for WSRA designation, approved by the Secretary of the Interior. 16 U.S.C. § 1273(a)(i), (ii). Rivers designated under the second provision, which must be administered by the state "without expense to the United States other than for administration and management of federally owned lands," are referred to as state-administered rivers. Id. § 1273(a).

The Lower St. Croix River Act of 1972 designated the upper stretch of the Lower St. Croix as a wild and scenic river, to be administered by the Secretary of

the Interior.  (Pub. L. 92-560, NPS 71.)  The Act further authorized designation of

the lower stretch upon application by the Governors of Minnesota and

Wisconsin.  (Id.)  It further provided that the Secretary of Interior was to jointly

act with the states to create a development plan that "shall provide for State

administration of the lower twenty-five miles of the Lower St. Croix River

segment."  (Id.)  In 1976, upon application by the Governors of Minnesota and

Wisconsin, the Secretary of the Interior approved the lower stretch of the Lower

St. Croix for inclusion "in the National Wild and Scenic Rivers System as a State

Administered Area of the National Scenic Riverway."  41 Fed. Reg. 26236 (June

25, 1976).  This lower segment, which begins at the northern limits of the City of

Stillwater and stretches south to Prescott, Wisconsin, was "designated a State

administered recreational river area in the National Wild and Scenic Rivers

System."  Id.

     Both the existing Lift Bridge and the Proposed Bridge are within the state-

administered portion of the Wild and Scenic Rivers System because the

Governors of Minnesota and Wisconsin applied for and received that designation

for the lower 25 miles of the St. Croix under 16 U.S.C. § 1273(a)(11).  See 16 U.S.C.

§ 1274(a)(9).  Therefore, the portion of the Lower St. Croix at issue here is

"permanently administered" by "an agency or political subdivision of the State

or States concerned."  16 U.S.C. §§ 1273(a)(ii), 1274(a)(9). See FitzGerald v. Harris,

549 F.3d 46, 48-49 (1st Cir. 2008) ("State-administered rivers are those rivers

designated after a state applies to the federal Secretary of the Interior under

section 2(a)(ii).  Federally-administered rivers are those established by Congress

under section 2(a)(i).  . . .  A single river may have zones that are

state-administered and others that are federally-administered.  E.g., id.

§ 1274(a)(9) (designating a section of the Lower St. Croix River as

federally-administered and providing that the governors of Wisconsin and

Minnesota may apply to have another segment designated as

state-administered)."); Kiernat v. Chisago County, 564 F. Supp. 1089, 1091 (D.

Minn. 1983) ("An additional 25 mile segment [of the Lower St. Croix River]

immediately south of this federal segment was to be included upon application

of the states of Wisconsin and Minnesota and jointly administered by those

states."); State v. St. Croix County, 668 N.W.2d 743, 745 (Wis. Ct. App. 2003)

("The lower 25-mile segment [of the Lower St. Croix] is to be administered by the

states of Minnesota and Wisconsin and is referred to as the 'state zone.'").

Sierra Club argues that, despite the clear statutory language, the lower

stretch of the Lower St. Croix is not state-administered based on NPS's joint management responsibility under the CMP and the federal government's expenditure of resources to manage this portion of the river. Sierra Club asserts that NPS shares management responsibility with the states over the 25-mile state-administered zone.

NPS's participation in cooperative management under the CMP does not change the state-administered designation of the lower portion of the Lower St. Croix. The WSRA explicitly provides that NPS shall cooperate with and assist states in managing their rivers, whether or not the rivers are state- or federally-administered:

> The Secretary of the Interior . . . shall assist, advise, and cooperate with States . . . to plan, protect, and manage river resources. Such assistance, advice, and cooperation may be through written agreements or otherwise. This authority applies within or outside a federally administered area and applies to rivers which are components of the National Wild and Scenic Rivers System and to other rivers. Any agreement under this subsection may include provisions for limited financial or other assistance to encourage participation in the acquisition, protection, and management of river resources.

16 U.S.C. § 1282(b)(1).

It is true that, as Sierra Club points out, the 2001 ROD regarding the CMP

provides that "[t]he states and the federal government jointly conduct planning

for the riverway." 66 Fed. Reg. 56848, 56848-89 (Nov. 13, 2001). However, the

ROD also provides that "[t]he states of Minnesota and Wisconsin administer the

lower 25 miles. " Id. The ROD reflects that the federal government and the

Minnesota and Wisconsin governments cooperate regarding the management of

the entire lower St. Croix Riverway, which consists of both federally- and state-

administered segments. In any case, the proclamations in the ROD have effect

only to the extent that they are consistent with applicable statutory language.

> **b.** **Effect of the State-Designation on NPS's Section 7 Duty**

WisDOT argues that the Court should defer to the states' joint decision on

how best to administer the state-administered recreational portion of the wild

and scenic river at issue here. Regardless of the WSRA's deference to state

decisions regarding state-administered rivers, NPS has the same duty to comply

with Section 7 when a water resources project is at issue. Here, Sierra Club is

challenging NPS action, not state action. Cf. FitzGerald v. Harris, 549 F.3d 46, 56,

57 n.5 (1st Cir. 2008) (discussing deference to state action regarding state-

administered Wild and Scenic River but not addressing level of scrutiny for

review of federal agency decisions because plaintiff "could have challenged the [Army Corps of Engineers] ACE permit under the APA but did not").

### 3. Whether NPS Arbitrarily Reversed Its Position in the 2005 Section 7 Evaluation

Sierra Club argues that NPS has reversed its policy regarding the permissibility of a four-lane bridge, approximately one mile south of the Lift Bridge over the lower portion of the Lower St. Croix. In the 1996 Section 7 Evaluation, NPS concluded that the 1995 Proposal would directly and adversely affect the Lower St. Croix's outstandingly remarkable scenic and recreational values and that no available mitigation package could adequately offset the negative effect. Sierra Club argues that in 2005, with no explanation for its reversal in position, NPS concluded that the substantially similar Proposed Bridge would not directly and adversely affect the scenic or recreational values.

Defendants retort that the 1996 Section 7 Evaluation was not a general rule or policy regarding bridges across the lower portion of the Lower St. Croix, but was, instead, a narrow, fact-specific evaluation of the 1995 Proposal, which is factually distinguishable from the current Proposed Bridge.

While the 1995 Proposal and the Proposed Bridge are substantially similar

– i.e., two large, four-lane bridges connecting TH 36 and STH 64 across the Lower

St. Croix approximately one mile south of the Lift Bridge – there are some

differences between the projects.  And, undoubtedly, federal agencies generally

have discretion to change their positions on issues.  However, because the 2005

Section 7 Evaluation completely omitted reference to the 1995 Proposal and the

1996 Section 7 Evaluation, the Court must conclude that NPS gave no thought to

its change in position.  A failure to acknowledge NPS's previous position, let

alone explain why, in NPS's opinion, a change is justified, is the hallmark of an

arbitrary and capricious decision.

### a. Applicable Standard of Review

"[A]n agency changing its course by rescinding a rule is obligated to

supply a reasoned analysis for the change beyond that which may be required

when an agency does not act in the first instance."  State Farm, 463 U.S. at 42.

"An agency's view of what is in the public interest may change, either with or

without a change in circumstances.  But an agency changing its course must

supply a reasoned analysis indicating that prior policies and standards are being

deliberately changed, not casually ignored . . . ."  Greater Boston Television Corp.

v. FCC, 444 F.2d 841, 852 (D.C. Cir. 1970) (footnotes omitted), quoted in State

<u>Farm</u>, 463 U.S. at 57.

The requirement that an agency explain a change in position is not only applicable to rescission of rules.  <u>See, e.g.</u>, <u>N.Y. Pub. Interest Research Group, Inc.</u> <u>v. Johnson</u>, 427 F.3d 172, 182-83 (2d Cir. 2005) (requiring that EPA provide a "reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored" when it reversed its policy position regarding circumstances in which an operating permit should be issued); <u>Springfield, Inc. v. Buckles</u>, 292 F.3d 813, 819-20 (D.C. Cir. 2002) (applying <u>State</u> <u>Farm</u> "reasoned analysis" standard to review Bureau of Alcohol, Tobacco and Firearms decision to reverse its policy that "a rifle's ability to accept a large, military-style magazine did not automatically disqualify it for importation" and, therefore, revoke import permits for firearms it had allowed in the past).

Put another way, "when an agency treats two similar transactions differently, an explanation for the agency's actions must be forthcoming." <u>Baltimore Gas & Elec. Co. v. Heintz</u>, 760 F.2d 1408, 1418 (4th Cir. 1985), <u>cited with</u> <u>approval in</u> <u>Duncan Energy Co. v. U.S. Forest Serv.</u>, 50 F.3d 584, 591 (8th Cir. 1995).  "Patently inconsistent application of agency standards to similar situations lacks rationality and is arbitrary."  <u>Contractors Transp. Corp. v. United</u>

States, 537 F.2d 1160, 1162 (4th Cir. 1976) (citation omitted).  See also id. ("[T]he grounds for an agency's disparate treatment of similarly situated applicants must be reasonably discernible from its report and order.") (citations omitted).

The Supreme Court has "frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner."  State Farm, 463 U.S. at 48.  Therefore, NPS could not simply ignore its prior policy in issuing the 2005 Section 7 Evaluation.  Although it did not need to provide better or stronger reasons for its new position than for its 1996 position, it was required to acknowledge its previous position and provide a reasoned explanation for its change:

> To be sure, the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.  An agency may not, for example, depart from a prior policy *sub silentio* . . . .  And of course the agency must show that there are good reasons for the new policy.  But it need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates.  This means that the agency need not always provide a more detailed justification than what would suffice for a new policy created on a blank slate.  Sometimes it must--when, for example, its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance

> interests that must be taken into account. It would be arbitrary or capricious to ignore such matters. In such cases it is not that further justification is demanded by the mere fact of policy change; but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy.

F.C.C. v. Fox Television Stations, Inc., 129 S. Ct. 1800, 1811 (2009) (citations omitted).

The Court reiterates that NPS was not bound by its 1996 Section 7 Evaluation when it evaluated the Proposed Bridge. NPS clearly has the power to reevaluate its prior determination. See, e.g., High Country Resources v. FERC, 255 F.3d 741, 748 (9th Cir. 2001) (holding that Forest Service had discretion to reevaluate its 1986 Section 7 decision regarding hydroelectric projects on the Skagit River because res judicata did not apply and "the existence of new information gave the Forest Service good reason to reevaluate the 1986 determination"). But, the agency must explain its reasons for changing its policy; the Court cannot provide that basis during APA review: The Court may not accept "counsel's *post hoc* rationalizations for agency action. It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." State Farm, 463 U.S. at 50 (citations omitted).

> **b.** **Whether the Proposed Bridge and the 1995 Proposal**

**Are Substantially Similar**

### i.    Introduction

Defendants argue that the 1996 and 2005 Section 7 Evaluations addressed wholly different projects; therefore, NPS's conclusion that the 1995 Proposal did have a direct and adverse effect on the Lower St. Croix's outstandingly remarkable values is not in conflict with its conclusion in the 2005 Section 7 Evaluation. Defendants claim that the Proposed Bridge incorporates various new minimization and mitigation measures, which are adequate to offset the adverse effect on scenic and recreational values.

In the 2005 Section 7 Evaluation, NPS concluded that "the preferred crossing, when taken along with its mitigation package would not have a direct and adverse effect on the scenic and recreational values for which the Riverway was included in the System." (NPS 518.)

In its 1996 Section 7 Evaluation, NPS found that construction of the 1995 Proposal would have a direct and adverse effect on the scenic and recreational values of the Lower St. Croix National Scenic Riverway, which could not be adequately mitigated. (NPS 436, 440.) The main basis for finding a negative impact on the recreational value was that the 1995 Proposal would "negatively

impact recreationists['] enjoyment of the natural and history scene." (NPS 440.)  It is NPS's conflicting analyses of the scenic impact in the 1996 and 2005 Section 7 Evaluations that are at the heart Sierra Club's claim of arbitrariness.

Sierra Club asserts that the 1995 Proposal is identical to the Proposed Bridge in all relevant respects.  Therefore, Sierra Club concludes that NPS's 2005 Section 7 Evaluation conclusion – that construction of a similar large bridge over the Lower St. Croix would not have a direct and adverse effect on the Riverway's scenic value with sufficient mitigation – written with no explanation for the reversal or citation to the 1996 Evaluation, was an arbitrary and capricious reversal in policy.  Sierra Club asserts that NPS was required – and failed – to supply a reasoned analysis for its change in policy.

### ii.    Comparison of the Two Bridges

The Proposed Bridge and the 1995 Proposal both call for a four-lane highway bridge to be built on nearly the same location and rise more than 100 feet above the Lower St. Croix with widths of more than 100 feet.  (NPS 386-87, 469.)  The 1995 Proposal would be located approximately 1 mile downstream of the Lift Bridge.  (NPS 386.)  The Proposed Bridge would be located 7,550 feet south of the Lift Bridge on the Minnesota shoreline and 6,450 feet south of the

36

Lift Bridge on the Wisconsin shoreline. (NPS 468.) Thus, although the locations are slightly different, they are close by one another.

The Proposed Bridge is longer and taller than the 1995 Proposal. The Proposed Bridge is approximately 1,000 feet longer than the 1995 Proposal: 3,930 feet for the 1995 Proposal versus 4,953 feet for the Proposed Bridge, including 2,840 feet over the river. (NPS 386, 469.) The height of the 1995 Proposal, not including lighting, would be 128 feet, while the deck height of the Proposed Bridge would be 159 feet, not including the 70-foot high towers. (NPS 387, 469; FHWA 7871.) However, the Proposed Bridge does have a perpendicular alignment, versus the more diagonal alignment of the 1995 Proposal. (NPS 1586.) Defendants also note that the portion of the Proposed Bridge over the river is minimally shorter that the portion of the 1995 Proposal over the river.

Defendants argue that an important difference is that the 1995 Proposal required 8 of the 25 piers to be placed in the riverbed, while the Proposed Bridge calls for only 4 to 6 piers in the riverbed. (NPS 387, 481.) NPS concluded that the impact on the free-flowing character of the river would be "minor" with the 1995 Proposal and "negligible" with the Proposed Bridge. (NPS 392, 483.)

The 1996 Section 7 Evaluation's determination of a direct and adverse

impact on scenic value was not based on individual components of the 1995

Proposal – such as the number of piers – , but, rather, was based on the overall

impact of a "massive bridge" with a "dramatic and disruptive" visual impact

based on many factors, including its "length and height" and both vertical and

horizontal visual impact.  (NPS 435-36.)  Similarly, in the 2005 Section 7

Evaluation, NPS characterized the Proposed Bridge as "highly disruptive;"

concluded that "[t]he length, height, mass and position of the bridge (crossing the

river) would make it more visually intrusive to river and riverbank users than

other developments in the affected area;" stated that the bridge's horizontal

visual impact would be "dramatic and disruptive to the view;" and concluded

that the project "would dramatically change and adversely affect the visual

character of the river."  (NPS 503-04.)  In both evaluations, NPS concluded that

placing a "bridge where there previously was not one results in a fundamental

change in the scenic qualities that existed in this portion of the Riverway at the

time of designation."  (NPS 435, 503.)  Although both evaluations cited the

particularly negative visual impact created by the respective bridges' heights,

lengths, location, and both horizontal and vertical impacts, and the Proposed

Bridge is both taller and longer than the 1995 Proposal and is located in almost

the same location, NPS made no attempt to distinguish the massive Proposed Bridge from the massive 1995 Proposal.

### iii.    Minimization Measures

Defendants retort that the minimization and mitigation measures in the Proposed Bridge differentiate it from the 1995 Proposal, although this point was not made anywhere in the 2005 Section 7 Evaluation.

In the 1996 Section 7 Evaluation, NPS concluded that there was no opportunity to reduce the negative visual impact through "location, site and layout." (NPS 434.) It further stated that no use of color, materials, or planting would be effective in lessening the visual impact. (NPS 435.)

In the 2005 Section 7 Evaluation, NPS concluded that the mostly perpendicular alignment of the Proposed Bridge minimized bridge length and bluff view impacts, and the extradosed bridge design would reduce apparent mass by minimizing the number of piers set in the river and the height. (NPS 504.) NPS admitted that "the use of color as a minimization method [would be] difficult to apply." (NPS 505.) It vaguely mentioned that "[o]ther strategies that may be effective in minimizing visual impacts would be to use treatments on the piers and abutments to provide an obvious connection to the historic materials

found in structures in nearby downtown Stillwater and the natural materials that

make up the river bluffs." (Id.) But those "treatments are being developed."

(Id.)

> Combining all minimization techniques, NPS concluded,

> These strategies minimize the impact of the proposed bridge to the
> extent possible. However, the construction of a bridge of this size
> would introduce a massive constructed feature that fundamentally
> alters the scenic qualities of this segment of the Riverway.
> Minimization strategies alone cannot reduce the impact of the
> proposed bridge on the scenic values of the Riverway to an
> acceptable level.

(NPS 505.) It concluded that, by combining minimization and mitigation

measures, the negative impact could be appropriately reduced. (Id.)

### iv.    Mitigation Measures

Defendants further argue that the Proposed Bridge includes new

mitigation items, such as the removal of a shoreline barge facility and industrial

building, removal of the Buckhorn sign, bluffland purchases and restoration, and

the conversion of the Lift Bridge to pedestrian and bike traffic. (NPS 505-08.)

The 2005 Evaluation only identifies a handful of mitigation measures within the

viewshed that would directly offset the visual impacts of the Proposed Bridge:

removal of the Xcel barge facility, the Buckhorn sign, and the Terra Terminal

Building, and bluffland restoration. (NPS 506.) NPS acknowledged the limited

effect of removing the Xcel Energy barge facility because its structures "are lower

in height and positioned parallel to the Minnesota riverbank" and "do not

obstruct views to [the] same degree as would the [Proposed Bridge]." (NPS 508.)

Removing the Buckhorn sign "provides very little in the way of restoring scenic

values" because its visibility "is very limited due to its position and vegetation

cover." (Id.) NPS did conclude that removal of the Terra Terminal Building

would be positive because it is visible for long distances, but also noted that the

mitigation would only be effective if the City of Stillwater allowed the site's

shoreline to be naturalized. (Id.) NPS noted that purchase of blufflands "would

not have the same scenic or wildlife value as that impacted by the [Proposed

Bridge]." (Id.) Finally, while other mitigation measures, such as the removal of

vehicular traffic from the Lift Bridge and the increased recreational facilities have

a positive impact on the noise levels and recreational values of the Lower St.

Croix, they do not mitigate the **visual** impact of the Proposed Bridge.

In the 2005 Section 7 Evaluation, NPS concluded that although "[t]here is

no one mitigation measure that completely offsets the impact" to scenic

resources, "the mitigation package minimizes the impact to the Riverway by

41

using the extrados bridge type, removes a number of existing visual intrusions to restore scenic values, and provides means to help prevent future visual impacts." (NPS 517.)  NPS failed to explain how combining this group of apparently ineffective measures can create an effective mitigation package, when, in 1996, NPS concluded that no available mitigation measures could significantly reduce the negative visual impact of a similar bridge.

All of the proposed visual mitigation measures in the 2005 Section 7 Evaluation relate to shoreland actions.  In the 1996 Section 7 Evaluation, NPS concluded that "[t]he visual impacts of the existing shoreline development, which interrupts the vegetative cover, is not comparable to visual impacts which would occur if the [1995] proposed bridge is constructed.  A bridge cutting across the river is fundamentally different in terms of its visual impacts than the impacts of shore and bank development."  (NPS 436.)  It followed that adequate mitigation cannot be achieved through restoration action on the shoreline.  (See NPS 436 ("The severity and magnitude of the visual impacts related to the proposed project are so great that they cannot be significantly reduced by the available mitigation measures.").)

In the 2005 Section 7 Evaluation, NPS similarly concluded, "The length,

height, mass and position of the bridge (crossing the river) would make it more visually intrusive to river and riverbank users than other developments in the affected area. A bridge cutting across the river is fundamentally different in terms of its visual impacts than the impacts of shore and bank development." (NPS 503-04.) As NPS had stated in the 1996 Section 7 Evaluation, in the new evaluation it noted that "[t]he placement of a visual obstruction horizontally across the river makes the visual impact far more dramatic and disruptive to the viewer." (NPS 436, 504.)

Despite proclaiming the same concern that the bridge's visual impact was simply not in the same category as the visual impact of shoreline development, NPS abruptly changed course in the 2005 Section 7 Evaluation and concluded that visual mitigation based on shoreline actions, when combined with minimization measures, adequately offset the bridge's negative visual impact.

### v. Conclusion

In this litigation, Defendants attempt to distinguish the 1995 Proposal from the current Proposed Bridge. They argue that, while the Proposed Bridge is longer and taller than the 1995 Proposal, it has a less serious visual impact due to the extradosed design, altered alignment and location, and fewer riverbed piers.

43

They point to new mitigation measures included in the newer plan.  While there are, indeed, differences between the two bridges, common sense provides that they are generally similar – in purpose, location, and physical characteristics.  In the 1996 Section 7 Evaluation, NPS's main concern for visual impact was based on the massiveness of a bridge spanning the Lower St. Croix in that basic location – a concern it concluded could not be effectively mitigated or minimized.  In the 2005 Section 7 Evaluation, NPS failed to explain why that concern has evaporated.

The Court is not concluding that NPS's attempt to distinguish the two bridges was inadequate; rather, the Court concludes that NPS **<u>wholly</u>** failed to mention, let alone distinguish, the 1995 Proposal and 1996 Section 7 Evaluation in the 2005 Section 7 Evaluation.

Because NPS failed to acknowledge the 1996 Section 7 Evaluation in its 2005 Section 7 Evaluation, Defendants cannot demonstrate that the "prior policies and standards are being deliberately changed, not casually ignored."  <u>Greater Boston Television Corp.</u>, 444 F.2d at 852.  NPS's attempts to explain its current position, as set forth in this litigation, cannot correct this fundamental flaw in the 2005 Section 7 Evaluation, because the Court may not accept "counsel's *post hoc*

rationalizations for agency action.  It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself."  State Farm, 463 U.S. at 50 (citations omitted).

### 4.	NPS's Consideration of Mussels

Sierra Club asserts that, irrespective of NPS's reversal of its previous policy, the 2005 Section 7 Evaluation is arbitrary and capricious because it fails to assess the impact of the Proposed Bridge on the Lower St. Croix's mussel population.  The 2005 Section 7 Evaluation does not evaluate the effect of the Proposed Bridge on any of the Lower St. Croix's mussel communities.  It merely mentions potential adverse effects on mussels in passing.  (NPS 487-88.)

In the 1996 Section 7 Evaluation, NPS professed its belief that the river's mussel populations "should be protected to the same extent as the outstandingly remarkable scenic and recreational values."  (NPS 410.)  NPS concluded that the 1995 Proposal would "negatively impact native mussels," and "has the very real potential of irreversibly altering the world class mussel community of the St. Croix River as a whole due to habitat fragmentation and the threat of zebra mussel infestations."  (NPS 420-21.)

The Lower St. Croix was added to the Wild and Scenic System based on its

outstanding scenic, recreational, and geological values, not its mussel population – or any of its fish and wildlife population.  (NPS 378, 466.)  Therefore, NPS had no obligation under the WSRA to evaluate the Proposed Bridge's effects on the mussel population.  The fact that NPS discussed mussels in the 1996 Section 7 Evaluation does not change NPS's legal obligation under Section 7.

However, NPS's complete about-face in policy – from stating that the mussels should be protected to the same extent as the river's outstandingly remarkable values and including an in-depth chapter devoted to the mussels to, in 2005, only mentioning the negative effect on the mussels in passing represents an abrupt change in position with no explanation whatsoever.  This further highlights NPS's failure to acknowledge that its 2005 Section 7 Evaluation represented a 180-degree change in position from its 1996 Section 7 Evaluation. NPS's reasons for its current decision do not need to be any more convincing than its reasons for its 1996 decision.  However, NPS may not simply ignore the 1996 Section 7 Evaluation.

5.      **Whether NPS's Authorization of the Proposed Bridge Violated the Lower St. Croix's Cooperative Management Plan**

a.      **Introduction**

Pursuant to the WSRA's requirement for development of a CMP, the Cooperative Management Plan for the Lower St. Croix was adopted in 2001. 66 Fed. Reg. 56,848 (Nov. 13, 2001). "The purpose of this plan is to describe the direction the managing agencies intend to follow in managing the lower riverway for the next 15 to 20 years while meeting the riverway's stated purpose. This plan provides a framework for proactive decision making . . ." (NPS 9.)

Sierra Club focuses on the portion of the CMP related to river crossings. "The [CMP's] long-term goal will be to reduce the number and size of visible river crossings." (NPS 53.) The CMP notes: "Crossings come in three forms: bridges for roads, railroads, pedestrians; overhead wires for communications and electrical energy; and under-river crossings (often called sub-marine crossings) for communications, electrical energy, and material such as fuel or natural gas." (Id.)

The CMP further states:

There will be no net increase in the number of transportation corridors. In general, transportation corridors will be replaced in or adjacent to the existing corridor. Existing transportation corridors will be relocated only if all of the following are true: 1) the need for the project is clearly justified, 2) the project is consistent with state and regional transportation plans, 3) there is no feasible and prudent alternative to relocating the corridor, and 4) all built elements of the

existing corridor are removed, and the corridor is restored to natural conditions. Existing corridors are defined as being roughly equivalent to the existing approach rights-of-way. Existing bridges may be replaced with new bridges provided that existing structures are removed.

(NPS 53.)

Sierra Club claims that NPS's approval of the Proposed Bridge, along with failing to remove the Lift Bridge, was unlawful because it violated the directives of the CMP by increasing the number of river crossings, by increasing the number of transportation corridors, and by violating the four-part test for relocating transportation corridors.

### b. Increase in the Number of River Crossings

The CMP broadly defines "crossings" to include pedestrian bridges as well as road bridges. There is no question that construction of the Proposed Bridge will increase the numbers of crossings over the Lower St. Croix – the Lift Bridge will continue to be a crossing because it will be used as a pedestrian and bicycle bridge and the Proposed Bridge will constitute an additional crossing because it will be a road bridge. However, the CMP does not provide a mandatory duty to avoid increasing the number of crossings. Rather, it expresses "a long-term goal" to reduce the number of crossings. Because the language of the CMP does not

48

provide a mandatory duty, Sierra Club cannot assert a claim against NPS based

on an increase in the number of crossings.

### c. Whether NPS Violated the Policy Regarding Transportation Corridors

### i. Whether the Converted Lift Bridge Will Continue to Qualify as a Transportation Corridor

Sierra Club asserts that the "no net increase in the number of

transportation corridors" requirement is violated because the Proposed Bridge

will exist alongside the existing Lift Bridge.  Sierra Club argues that the CMP

applies equally to "bridges for roads, railroads, [and] pedestrians."  (NPS 53.)

However, this quotation defines "crossings," not "transportation corridors."

"Crossings" is a broader term than "transportation corridors," because it includes

overhead wires and under-river crossings for electricity and gas, which are

indisputably not transportation corridors.  Sierra Club also refers to a set of

handwritten NPS notes which acknowledges one of the "weaknesses" of the 2005

Evaluation is its "[c]ompromise to non-proliferation policy."  (NPS 2121.)  This

handwritten note is of little value to the Court, and it is not apparent if the note

writer was addressing the CMP goal of not increasing crossings or the CMP

directive to not increase transportation corridors.

In contrast, NPS has interpreted the term "transportation corridor" to not include non-vehicular bridges. In the 2005 Section 7 Evaluation, NPS concluded that removing vehicular traffic from the Lift Bridge "[h]elps meet CMP policy of no net increase in number of transportation corridors by eliminating motorized vehicles." (NPS 507. <u>See also</u> NPS 508-09 ("Removing vehicular traffic from the Lift Bridge . . . would maintain the current number of vehicular transportation crossings of the Riverway.").) (In an earlier July 2004 review, NPS specifically stated how converting the Lift Bridge to eliminate vehicular traffic would allow the Proposed Bridge to satisfy the CMP's requirement that there be "no net increase in the number of transportation corridors crossing the Riverway." (NPS 1587.))

The Court concludes that, in context, a "transportation corridor," at a minimum, requires motorized traffic or moving goods or persons for non-recreational purposes. The proposed pedestrian and bicycle bridge does not meet the definition of transportation corridor, when the Lift Bridge will be for non-motorized, recreational use. The CMP defines crossings to include pedestrian and bicycle bridges, but "crossings" is a far broader term, including

50

underground gas lines and power lines.  Additionally, the CMP's four-part test for relocated "transportation corridors" addresses whether the project is "consistent with state and regional transportation plans."  (NPS 53.)  A recreational pedestrian and bicycle path is not typically part of a regional transportation plan.  In any case, in the view of the lack of guidance in the CMP, NPS's interpretation of the term "transportation corridor" to require motorized traffic is, at a minimum, reasonable.  The Court concludes that the Proposed Bridge will not violate the CMP's statement that there "will be no net increase in the number of transportation corridors."

**ii.    Whether NPS Addressed the CMP Factors for Relocating the Transportation Corridor**

Sierra Club asserts that NPS did not abide by the CMP's four-factor test for relocation of a transportation corridor.  Specifically, Sierra Club argues that the Proposed Bridge plan fails to comply with the fourth requirement, that "all built elements of the existing corridor are removed, and the corridor is restored to natural conditions."  (NPS 53.)

Defendants note that closing the Lift Bridge to vehicular traffic and converting it to a pedestrian and bicycle trail will enhance the recreational values

of the river while still preserving the scenic, historic Lift Bridge structure.  The

CMP envisions expansion of trails within the Riverway.  (NPS 49.)  Additionally,

the CMP emphasizes preserving and protecting the historic cultural values and

structures in the Lower St. Croix, particularly those listed on the National

Register of Historic Places, and promoting "adaptive reuse of existing historic

structures."  (NPS 31, 55-57.)  Therefore, the CMP, itself, contains competing

direction to, on the one hand, eliminate all built elements of the Lift Bridge and,

on the other hand, preserve the Lift Bridge and adapt it for reuse.

Additionally, the Department of Interior has a competing legal

responsibility to preserve the historic value of the Lift Bridge, which is on the

National Register of Historic Places, administered by NPS.  (NPS 79-101.)

Because the Lift Bridge has historic value and is listed on the National Register of

Historic Places, NPS was required to consider the Lift Bridge's historical value

when deciding whether to approve the Proposed Bridge plan.  16 U.S.C. § 470f.

The 2005 Section 7 Evaluation demonstrates that NPS attempted to balance

the historic value of the Lift Bridge, adaptive reuse to increase recreational value,

and preservation of the natural scenery when NPS stated:  "Closure of the Lift

Bridge to motorized traffic would allow for partial restoration of the Wisconsin

bluff at the approach to the Lift Bridge and improve the aesthetics of the area by removing traffic noise, while preserving a historic bridge." (NPS 509.) NPS further recognized, however, that allowing the Lift Bridge to remain would "create an increased urban nature" in this portion of the river. (Id.) NPS also explained that conversion of the Lift Bridge and creation of the connected trail would increase recreational value. (NPS 515.)

Although the Lift Bridge will no longer constitute a transportation corridor, Sierra Club is correct that, technically, not all built elements of the Lift Bridge will be removed and it will not be restored to its natural conditions. While NPS's 2005 Section 7 Evaluation does not rigidly comport with the fourth factor for relocating existing transportation corridors, the Court concludes that this conflict does not provide a viable cause of action for violation of the WSRA or an independent cause of action for violation of the CMP.

First, as to the integrity of the Section 7 Evaluation, NPS's decision to not completely remove the Lift Bridge from the Lower St. Croix was not an arbitrary or capricious decision violating Section 7. NPS faces competing interests with regard to the Lift Bridge – the interest in the preservation of the natural conditions of the Lower St. Croix under the WSRA and the interest in preserving

the Lift Bridge itself as a National Historic site. Additionally, the Lift Bridge was in existence long before the relevant portion of the Lower St. Croix became part of the Wild and Scenic River system. The Lift Bridge is a unique bridge in that it does provide scenic and recreational value as a National Historic site and a revamped recreational trail. Moreover, under the Proposed Bridge plan, some of the Lift Bridge's built elements will be removed insofar as the approaches to the Lift Bridge will be restored to a more natural condition. (See NPS 474 (providing that "[t]he existing approach roads to the Lift Bridge would be restored" and the areas would be "revegetated").) In context of the entire CMP, the Court does not read the fourth factor to be a clear mandatory duty. NPS has not violated the WSRA simply because the decision to keep the Lift Bridge's structure in place conflicts with a factor listed in the CMP, when complete removal would conflict with other CMP provisions. Moreover, this CMP is merely a general framework to give direction in management of the river, not a statutory mandate. (See ROD, 66 Fed. Reg. 56848, 56851 (Nov. 13, 2001) (providing that the CMP was implemented to provide a "policy-level management framework for the riverway"); CMP, NPS 9 (providing that CMP's purpose is to "describe the direction the managing agencies intend to follow in managing the lower

riverway for the next 15 to 20 years while meeting the riverway's stated purpose"
and that it "provides a framework for proactive decision making"); 2005 Section 7
Evaluation, NPS 468 ("The Cooperative Management Plan (CMP) was finalized
in January 2002 and provides general direction for managing the Riverway over
the next 15-20 years.") (citation omitted).)

The Court further concludes that there is no basis for determining that, as
to the portion of the CMP at issue here, the CMP creates mandatory duties,
enforceable by Sierra Club in this action. NPS **is** statutorily required to prepare a
CMP in accordance with the WSRA, and, in the Secretarial Guidelines, NPS has
professed that it will use CMPs in managing Wild and Scenic Rivers. See 16
U.S.C. § 1274(d)(1); Secretarial Guidelines, 47 Fed. Reg. 39,454, 39,458 (Sept. 7,
1982) ("Wild and scenic rivers shall be managed with plans prepared in
accordance with the requirements of the [WSRA] . . . ."); id. ("Management plans
will state . . . specific management measures which will be used to implement the
management objectives for each of the various river segments and protect
esthetic, scenic, historic, archeologic and scientific features."). However, NPS is
not statutorily required to implement every line in the CMP. See, e.g.,
Riverhawks v. Zepeda, 228 F. Supp. 2d 1173, 1186 (D. Or. 2002) (holding that

"plaintiffs provide no persuasive authority that the [CMP's] requirement [that "[a] recreation plan will be prepared for the river area"] is enforceable").

In this case, in which the CMP provides a general, long-term policy framework; the action that is a technical violation of the CMP – the failure to remove all built elements of the historic Lift Bridge – does not otherwise conflict with NPS's Section 7 mandate; there are competing statutory considerations regarding removal of the Lift Bridge; and removal of all built elements would conflict with other provisions of the CMP, the Court holds that Defendants are entitled to summary judgment on Count I.

### 6. Whether NPS Applied the "Protect and Enhance" Requirement of the WSRA, Section 10(a)

Section 10(a) of the WSRA requires that each wild and scenic river be "administered in such manner as to protect and enhance the values which caused it to be included in said system without, insofar as is consistent therewith, limiting other uses that do not substantially interfere with public use and enjoyment of these values." 16 U.S.C. § 1281(a). The 1982 Secretarial Guidelines interpret Section 10(a) "as stating a nondegradation and enhancement policy for all designated river areas, regardless of classification." 47 Fed. Reg. 39,454,

56

39,458.  Sierra Club argues that NPS failed to address Section 10(a)'s non-degradation policy; therefore the 2005 Section 7 Evaluation is contrary to law.

The Court concludes that the obligations of Section 10(a) do not apply to NPS's Section 7 evaluation when the Proposed Bridge is located within the state-administered portion of the Lower St. Croix.  See Fitzgerald v. Harris, Civil No. 07-16-B-W, 2007 WL 2409679, at *4 (D. Me. Aug. 20, 2007) (noting that Section 10 "addresses primarily administrative responsibilities vis-à-vis federally owned components of the system"), adopted Civil No. 07-16-B-W, 2008 WL 375252 (D. Me. Feb. 11, 2008), aff'd 549 F.3d 46 (1st Cir. 2008).  The states, not NPS, administer the lower portion of the Lower St. Croix.  By conducting a Section 7 evaluation, NPS does not convert a state-administered river into an NPS-administered river.

Sierra Club's reliance on Sokol for the proposition that NPS's Section 7 Evaluation of a project within the state-administered zone was an "administrative act" subject to Section 10(a) is misplaced.  In Sokol, the Eighth Circuit held that Section 10(a) applied to NPS's action of selecting the boundaries of a federally-administered river component that, at Congress's direction, was "administered by the Secretary of the Interior."  Sokol, 210 F.3d at 877; 16 U.S.C.

§1274(a)(117). Section 10(a) does not apply to NPS's Section 7 evaluation of a water resources project located within a state-administered component of a wild and scenic river.

### 7. Whether NPS Violated the Organic Act and General Authorities Act

Sierra Club asserts that the 2005 Section 7 Evaluation is arbitrary and capricious because NPS approved the Proposed Bridge without considering the non-impairment requirement of the Organic Act and General Authorities Act.

The 2005 Section 7 Evaluation provided:

> Section 7(a) of the Wild and Scenic Rivers Act directs the administering official to evaluate the 'direct and adverse impacts' of a water resource project. It does not authorize the administering official to examine indirect impacts. The NPS has commented on those indirect impacts through the NEPA process, but it cannot focus on them during its Section 7(a) evaluation.

(NPS 490.) Sierra Club asserts that NPS failed to apply the relevant statutory authority by ignoring indirect effects relevant under the Organic Act and General Authorities Act.

By their own terms, the Organic and General Authorities Acts apply to the administration of the national park system. Because the Proposed Bridge would be located in the state zone of the Riverway, the Organic Act and General

58

Authorities Act do not apply.  Under the WSRA, any part of the Wild and Scenic River System administered by NPS becomes part of the National Park System.  16 U.S.C. § 1281(c).  As the Court has already concluded, the lower segment of the Lower St. Croix is state-administered.  Therefore, the southern segment of the Lower St. Croix is not part of the national park system.

Additionally, Plaintiffs have failed to point to evidence in the record that the Proposed Bridge will have a scenic impact within the federal zone.  The parties note that the 2005 Section 7 Evaluation states that a site visit to locations on the Minnesota bank approximately 17,400 feet north of the preferred crossing indicated that "the preferred crossing would not likely be visible from these locations."  (NPS 498-499.)  "Because of a bend in the river, the preferred crossing would be blocked from view by the Wisconsin bluff and the vegetative cover on it."  (NPS 499.)  The Proposed Bridge would not become visible until further downstream.  (Id.)  Similarly, the Proposed Bridge would not be visible on the Wisconsin side of the river at this distance.  (Id.)  NPS specifically found that "[t]he preferred crossing would not be visible from the Wisconsin side of the river between Boomsite Landing [north of the Lift Bridge] and the Lift Bridge."  (Id.)

However, the parties do not point the Court to evidence that the Proposed Bridge would be seen from within the federal zone. There is no evidence sufficient to support Sierra Club's argument that the Proposed Bridge will negatively impact the scenery in the federal zone; therefore, the Court cannot conclude that the Organic and General Authorities Acts might apply based on a possible scenic impact to the portion of the Lower St. Croix within the national park system.

Finally, the Court rejects Sierra Club's claim that, in a 1990 letter from the Department of Interior, NPS previously acknowledged that the Organic Act applies to this portion of the Riverway. (See FHWA 337 (citing 1990 letter from Department of Interior opining that NPS's recommendation regarding a Stillwater-Houlton bridge will depend, in part, on its "interpretation of its mandates under the Wild and Scenic Rivers Act and the National Park Service's 1916 Organic Act.")). This excerpt from the 1990 letter does not state a position that the Organic Act applies, but rather, provides that NPS must interpret its mandate – if any – under the Organic Act in order to form its recommendation on the bridge.

The Court grants summary judgment for Defendants on Count IV.

### 8. Whether NPS Granted an Unlawful Right of Way

Sierra Club has abandoned Count V, alleging that NPS granted an unlawful right of way over the Lower St. Croix. Therefore, the Court dismisses Count V.

### C. Whether FHWA Violated NEPA

### 1. Introduction

Sierra Club asserts that FHWA violated NEPA by failing to consider the following reasonable alternatives to the Proposed Bridge: a new two-lane crossing replacing the Lift Bridge; cumulative alternatives, such as a two-lane bridge combined with Transportation System Management/Transportation Demand Management ("TSM/TDM") strategies; Sierra Club's reversible lane proposal for Alternative E; Alternative E1, a slower and lower version of Alternative E; and expanding capacity at I-94. "[W]hile the EIS need not be exhaustive, the existence of a viable but unexamined alternative renders an [EIS] inadequate." <u>Friends of the Boundary Waters Wilderness v. Dombeck</u>, 164 F.3d 1115, 1128 (8th Cir. 1999) (citation omitted).

Sierra Club also claims that FHWA violated NEPA by failing to adequately address the indirect and cumulative impacts of the Proposed Bridge.

### 2. Standard

NEPA requires that a federal agency prepare an FEIS whenever it recommends a 'major federal action[ ]' that will 'significantly affect[ ] the quality of the human environment.' 42 U.S.C. § 4332(C). NEPA's requirements are more procedural than substantive. Preparation of an FEIS forces the agency to take a 'hard look' at environmental consequences and to inform the public that environmental concerns have in fact been considered. But NEPA does not mandate particular agency decisions, and accordingly judicial review under NEPA is limited to ensuring that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious. The reviewing court is not empowered to substitute [its] judgment for that of the agency.

City of Bridgeton v. FAA, 212 F.3d 448, 455 (8th Cir. 2000) (citations omitted).

Adequate agency consideration is evidenced through the EIS's form, content, and preparation. We need not 'fly speck' an EIS for inconsequential or technical deficiencies. Instead, we consider whether the agency's actual balance of costs and benefits was arbitrary or clearly gave insufficient weight to environmental values.

Dombeck, 164 F.3d at 1128 (citations omitted).

### 3. Whether FHWA Failed to Address a Reasonable Range of Alternatives

#### a. Waiver

Defendants argue that Sierra Club cannot challenge the EIS based on

alternatives that Sierra Club, itself, did not raise administratively. Defendants

note that "[p]ersons challenging an agency's compliance with NEPA must structure their participation so that it . . . alerts the agency to the [parties'] position and contentions in order to allow the agency to give the issue meaningful consideration."  Dept. of Transp. v. Pub. Citizen, 541 U.S. 752, 764 (2004) (citation omitted).

Public Citizen "did not limit *who* could bring actions under NEPA based on participation in the administrative process; rather, it limited *what* could be raised in those actions."  Choate v. U.S. Army Corps of Eng'rs, No. 4:07-CV-01170-WRW, 2008 WL 4833113, at *5 (E.D. Ark. Nov. 5, 2008) (footnote omitted). Therefore, "[a] party that did not participate in the administrative process may challenge the agency's decision in court so long as the party raises issues that were submitted by others during the administrative process."  Id. (footnote omitted).  Public Citizen addressed situations in which an agency had no notice of an alternative, because, in those cases, the agency would be deprived of "*any* opportunity to consider the issue that the challenger later sought to raise in litigation."  Sierra Club v. Kimbell, 595 F. Supp. 2d 1021, 1031 (D. Minn. 2009).

In this case, the Court does not find waiver because all of the alternatives Sierra Club now puts forth were brought to FHWA's attention at some point

during the administrative process. (See Nov. 30, 2001, U.S. Institute for Environmental Conflict Resolution Assessment, NPS 1447 (noting that some stakeholders favored consideration of a two-lane bridge and recommending that the alternative be addressed in the EIS); Jan. 6, 2004, Stakeholder Meeting Summary, FHWA 2758 ("There was agreement that mass transit should be included, as well as any feasible/reasonable elements of Alternative A."); July 19, 2005 Email to stakeholders, FHWA 7522 (explaining that, at the beginning of the Stakeholder process, transportation agencies were asked to study "a 'smaller scale' system (size of structures, lane widths, design speed, etc.)"); Jan. 4, 2004, memorandum summarizing agency and stakeholder comments to 2003 Amended Scoping Document, FHWA 31575-76 (noting that Sierra Club proposed detailed consideration of reversible lanes for Alternative E and emphasizing that mass transit and TSM/TDM should be studied with all alternatives); SFEIS, Responses to Comments on the Supplemental Draft EIS, FHWA 8357-58 (addressing and rejecting possibility of increasing capacity at I-94); Jan 9, 2004 Email to stakeholders from stakeholder, FHWA Doc. 2774 (proposing Alternative E-1)).

    **b.**   **Whether FHWA Should Have Considered a Two-Lane**

## Replacement Bridge Option

Sierra Club argues that FHWA failed to consider a new two-lane replacement for the existing Lift Bridge.  Sierra Club argues that the two-lane alternative should have been considered because such a smaller-scale crossing would have reduced impacts to the Riverway's scenic and recreational values. See Coalition for Canyon Preservation v. Bowers, 632 F.2d 774, 784 (9th Cir. 1980) (finding consideration of two-lane road alternative "was both reasonable and obvious" and failure to analyze it rendered EIS inadequate).

The Court holds that FHWA had no duty to consider a two-lane option because that option would not meet the need and purpose of the project.

According to the SFEIS,

The project purpose is to improve Minnesota Trunk Highway 36 and Wisconsin State Trunk Highway 64 between Trunk Highway 5/County State Aid Highway (CSAH) 5 in Oak Park Heights and Stillwater, Minnesota, and 150th Avenue in the Town of St. Joseph, Wisconsin, to provide a safe, reliable, and efficient transportation corridor by reducing congestion, improving roadway safety, and providing an adequate level of service for forecasted year 2030 traffic volumes.  Transportation needs for this project fall into two primary categories:

• Transportation mobility on a safe and efficient facility;

• A reliable crossing of the St. Croix River.

(FHWA 7840 (footnote omitted).)

NEPA does not require an agency to consider, in an EIS, "unreasonable" alternatives that do not meet a project's purpose and need. <u>City of Richfield, Minn. v. F.A.A.</u>, 152 F.3d 905, 907 (8th Cir. 1998) ("Under NEPA, an EIS must examine 'reasonable alternatives' to a project. . . . An alternative is unreasonable if it does not fulfill the purpose of the project.") (citations omitted). The SDEIS noted that construction of a two-lane bridge was studied in the 1999 Amended Scoping Decision process. (FHWA 4163.) The SDEIS stated, "After consideration of travel forecasts and information related to safety and roadway design it was concluded [in 1999] that a two-lane alternative was not a reasonable and prudent alternative to meet the project need and travel forecasts and would not be studied further." (<u>Id.</u>)

> **c.    Whether FHWA Should Have Considered a Variation of Alternative E that Would Accommodate Lift Bridge Closures: Reversible Lane Alternative**

Sierra Club argues that the concept of a reversible lane should have been considered. Instead, only Alternative E – a combination of one-way bridges, with no reversible lane – was considered in the EIS. Sierra Club concludes that

dismissal of this alternative "in a conclusory and perfunctory manner" was arbitrary and capricious because FHWA failed to "[r]igorously explore and objectively evaluate" the reversible lane option as a reasonable alternative. 40 C.F.R. § 1502.14(a); Davis v. Mineta, 302 F.3d 1104, 1122 (10th Cir. 2002).

The SFEIS explained in detail why Alternative E was not identified as the Preferred Alternative in the SFEIS. Whether Alternative E was designed to include reversible lanes or not, the same factors that caused FHWA to make its decision would have existed. NEPA does not require an agency to "undertake a separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered or which have substantially similar consequences." Westlands Water Dist. v. U.S. Dept. of Interior, 376 F.3d 853, 868 (9th Cir. 2004) (citation omitted).

In this case, FHWA rejected Alternative E for multiple reasons such as:

Regional Vehicle Hours Traveled (VHT) would decrease with Alternative E compared to the No-Build Alternative; however, this decrease is less than with Alternative B-1.

Regional Daily Vehicle Miles Traveled (VMT) would increase with Alternative E compared to the No-Build Alternative. Regional Daily VMT would decrease with Alternative B-1.

More local intersections operating at unacceptable Level of Services

("LOS") (LOS E or F) than with Alternative B-1.

* * *

More residential and commercial properties would be acquired under Alternative E than with Alternative B-1.

* * *

Close proximity of Alternative E river crossing to downtown Stillwater  would result in visual impacts to Lowell Park (a Section 4(f) resource).

Land would be acquired from Kolliner Park (a Section 4(f) resource) to accommodate the Alternative E river crossing and new STH 64 whereas Alternative B-1 will not acquire land from Kolliner Park.

* * *

Seven NRHP-listed, determined eligible, or potentially-eligible historic properties would be adversely affected by Alternative E, compared to six properties for Alternative B-1.

The likelihood of receiving a positive Section 7(a) Evaluation from the NPS with Alternative E, similar to Alternative D, was unknown and contributed to the elimination of the alternative from further consideration.  In a preliminary review of the Build Alternatives for the SDEIS, the NPS had indicated that Alternative E may not be able to receive a favorable Section 7(a) Evaluation, even with a strong mitigation package.

(FHWA 7862-7864.)  While the reversible lane variation would address a few of

the reasons for rejecting Alternative E, such as the fact that Lift Bridge closures

would halt all westbound traffic, it does not resolve the multitude of reasons listed above.

Additionally, Alternative E – and the reversible lane variation – relied on the Lift Bridge to remain a viable crossing, although "the Lift Bridge cannot provide reliable service" due to deck lifts, elevation, and physical condition. (FHWA 7848.)  "[T]he Lift Bridge is already beyond the normal operational life of a bridge structure.  Studies have raised substantial structural concerns regarding the Lift Bridge's machinery, structure, and substructure.  The condition of these components and recent operational experience suggest that the Lift Bridge is nearing the end of its 'useful service.'" (FHWA 7849 (footnote omitted).)  The SFEIS opined that, by 2020, a major rehabilitation would be needed "and would result in closing the bridge to traffic for approximately two years."  (Id.)  According to the SDEIS, this would leave the new Alternative E bridge as the sole two-way bridge, with one lane in each direction, which would not meet traffic needs and would require a new river crossing option.  (FHWA 4158)

FHWA and the Stakeholders Group evaluated multiple alternatives, including an alternative utilizing the Lift Bridge in conjunction with a new two-lane bridge.  Although FHWA did not discuss each variation of Alternative E,

69

such as the reversible lane option, the Court concludes that FHWA's selection of alternatives to discuss in the SFEIS met the "rule of reason." <u>City of Bridgeton</u>, 212 F.3d at 455.

### d. Whether FHWA Should Have Considered Alternative E1

Alternative E1 was a lower, slower version of Alternative E, with fewer environmental impacts. (FHWA 2774.) Sierra Club asserts that Alternative E1 could have reduced the environmental impacts associated with Alternative E.

For the same reasons that FHWA did not violate the law by rejecting the reversible lane alternative, it did not do so by rejecting Alternative E1. Alternative E1 was not significantly distinguishable from Alternative E.

### e. Whether FHWA Should Have Considered Expansion of the I-94 Corridor

Sierra Clubs asserts that the EIS should have considered expanding capacity at the existing I-94 crossing in Hudson. Citing to comments by the Minnesota Center for Environmental Advocacy, Sierra Club argues that traffic diverted from I-94 may be increasing congestion on the Lift Bridge. (Oct. 6, 2004, Minnesota Center for Environmental Advocacy, Comments on SDEIS, FHWA 32821 (noting that approximately half of trips are work-related and suggesting

diverting regional work-related trips to I-94 through tolling and asserting that, because I-94 is nearing capacity, limited capacity may be diverting traffic to the Lift Bridge, a result which might be ameliorated with improvements to I-94).) Sierra Club asserts that expansion of the I-94 crossing might have addressed the project's goals of reducing congestion, improving safety, and providing adequate service for 2030 traffic volumes, while avoiding "impacts to the Riverway's channel, shoreline, bluffs, air quality and water quality." (<u>See</u> FHWA 7840, 7843.)

FHWA determined that expanding capacity on the existing I-94 corridor would not have addressed the purpose of the project. The purpose of the project is to improve the TH36/STH64 corridor. There is already an existing transportation corridor over the Lower St. Croix between TH 36 and STH 64. However, the corridor is currently served by a failing Lift Bridge that no longer effectively serves Minnesota and Wisconsin's transportation systems. Beyond brief questions by the Minnesota Center for Environmental Advocacy, Sierra Club points to no evidence in the record that expanding a different transportation corridor might effectively address the problems in the TH 34/STH 64 corridor. Although the Minnesota Center for Environmental Advocacy questioned whether redirecting work-related traffic might reduce Lift Bridge traffic, there is

71

no evidence of the possible effectiveness of this idea, nor any suggestion that enough traffic could be redirected to address the problems caused by the Lift Bridge's frequent closure or need to be shut down entirely for major renovation in the near future. Therefore, this solution was unreasonable because it did not fulfill the project's purpose. See City of Richfield, 152 F.3d at 907. See Mayo Found. v. Surface Transp. Bd., 472 F.3d 545, 550-51 (8th Cir. 2006) (upholding agency failure to "consider [an] alternative because that route is simply inconsistent with the project's purposes" and therefore is not a "reasonable alternative").

### f.  Whether FHWA Should Have Considered a Cumulative Alternative

Sierra Club asserts that FHWA's failure to consider the cumulative alternatives including TSM/TDM rendered the EIS arbitrary and capricious. Instead, FHWA only considered mass transit and TSM/TDM strategies as a stand-alone option with the existing Lift Bridge, which the agency had already decided was unreliable. (FHWA 7849-52.) Sierra Club argues that, by only considering TSM/TDM separately, FHWA failed to analyze whether these strategies could satisfy the project's purpose and need when combined with a

new, smaller-scale bridge.

FHWA analyzed Alternative A, which included TSM/TDM strategies with the no-build alternative, but rejected it because it did not meet the purpose of the project. FHWA concluded that implementing all possible TSM/TDM strategies would have an imperceptible effect on peak traffic volumes and congestion in the project area. (See, e.g., FHWA 7851 (concluding that an extensive TSM/TDM program implementing all possible TSM/TDM strategies would cause a 5.2 percent decrease in bridge traffic per day; however, due to "back filling" of trips, peak period reductions "would likely not be perceptible to motorists, would not meet broader regional travel needs, and would not reduce the number of vehicles per lane in the peak hour from existing congested levels").) However, inquiry into this area did spark a transit feasibility study by the state DOTs.

The Court cannot say that FHWA acted arbitrarily and capriciously by failing to study the combination of other build alternatives along with a TSM/TDM alternative that would have an imperceptible effect and would not reduce the number of vehicles per lane in the peak hour. This is not an instance of FHWA only addressing two alternatives overall or failing to consider the combined effect of other alternatives with a TSM/TDM strategy when the record

demonstrated that the TSM/TDM strategy "could significantly contribute to traffic management in the area." Cf. Davis v. Mineta, 302 F.3d 1104, 1121-22 (10th Cir. 2002) (holding FHWA violated NEPA by rejecting "Transportation System Management (TSM) and mass transit . . . because, standing alone, they would not meet the purpose and need of the Project" and considering only two alternatives – the no-build alternative and the preferred alternative – and holding, instead, FHWA should have considered TSM and mass transit together with other alternatives when "[a]ccording to the various reports in the record, TSM could significantly contribute to traffic management in the area and mass transit in any number of iterations is apparently under active consideration in this area by a number of jurisdictions involved").

Overall, while Sierra Club "points to some alternatives that might have been considered or discussed more fully, the 'detailed statement of alternatives cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable.'" Laguna Greenbelt, Inc. v. U.S. Dept. of Transp., 42 F.3d 517, 528 (9th Cir. 1994) (quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 551 (1978)). The SFEIS discusses an appropriate range of reasonable alternatives

sufficient to satisfy NEPA.

### 4. Whether FHWA Adequately Addressed Indirect Impacts

Indirect effects

are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

40 C.F.R. § 1508.8(b). Sierra Club asserts that FHWA failed to seriously analyze the effect of increased land development caused by the Proposed Bridge.

Sierra Club asserts that the EIS lacks any meaningful analysis of the Proposed Bridge's indirect effects on Wisconsin's natural and cultural resources, such as water quality, wetlands, and wildlife habitat. While FHWA recognized that the project could cause increased growth, FHWA failed to analyze the environmental ramifications of that growth "on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b). Sierra Club claims that the discussion of indirect impacts to natural resources in the SFEIS is simply a laundry list of other agencies' concerns. (FHWA 8154-56.) It concludes that these concerns were not "thoroughly investigated and forthrightly acknowledged."

Nat'l Audubon Soc'y v. Dept. of Navy, 422 F.3d 174, 199 (4th Cir. 2005).

Sierra Club notes that, during the circulation of a "cooperating agency draft" of the Final EIS in June 2005, various Stakeholders mentioned that the indirect effects analysis was inadequate.  (See, e.g., August 1, 2005 Letter from NPS commenting on Draft SFEIS, FHWA 34924 (concluding that draft "indirect impacts analysis lacks substance" and requesting that FHWA "evaluate the potential impacts to natural resources, especially water quality, that are predictable with the known population growth and development pressure that will result from the preferred alternative").)  Sierra Club argues that FHWA made only a few changes in response to these comments.  See Mid States Coalition for Progress v. Surface Transp. Bd., 345 F.3d 520, 537 (8th Cir. 2003) (finding EIS inadequate because agency failed to satisfy "minimum requirement" of assessing, considering, and responding to all comments) (citing 40 C.F.R. 1503.4(a)).  Sierra Club admits, however, that all of the agencies who criticized the indirect effects analysis in the cooperating agency draft of the Final EIS dropped their objections or signed mitigation agreements.  See Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dept. of Transp., 524 F. Supp. 2d 642, 664 (D. Md. 2007) ("It is also worth noting that the agencies

Plaintiffs referred to, who initially gave negative comments . . . concurred that their comments had been addressed in the version that ultimately appeared in the EIS.").

Sierra Club also argues that FHWA's conclusory statements regarding indirect effects lacked supporting data.  See Friends of the Boundary Waters Wilderness v. Bosworth, 437 F.3d 815, 822 (8th Cir. 2006) (noting that "agency must provide a satisfactory explanation for its actions based on relevant data") (citation omitted).

The Court holds that FHWA's indirect effect analysis was sufficient.  (See SFEIS Chapter 13, FHWA 8141-63.)  It identified indirect effects and mitigation measures to minimize those effects.  FHWA analyzed existing and future land use, existing and future population estimates, growth management strategies from local plans, and land use regulation and ordinances such as zoning.  Local planning documents, such as the St. Croix County Development and Management Plan, plan for construction of a new river crossing.  (FHWA 8149.) FHWA also held discussions with local government and planning officials on land use trends.  (FHWA 8146.)  This analysis and reliance on local land use plans and planners was sufficient.  See, e.g., Utahns for Better Transp. v. U.S.

Dept. of Transp., 305 F.3d 1152, 1174 (10th Cir. 2002) (upholding similar indirect

effects analysis and noting authority for EIS to rely on local planning documents

and consultations with local planners ), modified, 319 F.3d 1207 (10th Cir. 2003);

City of Carmel-By-The-Sea v. U.S. Dept. of Transp., 123 F.3d 1142, 1162-63 (9th

Cir. 1997) (holding EIS sufficient even though proposed freeway would

"induce[]" development because FEIS "admits that development may result from

the freeway project" and "[t]his development is nonetheless planned for in the

Carmel Valley Master Plan; it has been accounted for and properly analyzed.  No

further analysis is warranted.") (citations omitted).

### 5.      Whether FHWA Adequately Addressed Cumulative Impacts

Cumulative impact is the impact on the environment which results
from the incremental impact of the action when added to other past,
present, and reasonably foreseeable future actions regardless of what
agency (Federal or non-Federal) or person undertakes such other
actions.  Cumulative impacts can result from individually minor but
collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.

Sierra Club argues that the Final EIS's cumulative impacts chapter lacks

any quantified or detailed information about the impact of the Proposed Bridge

and other projects on multiple natural resources.  Sierra Club argues that an

adequate EIS would include scientific studies, methodologies, and data. "General statements that merely catalog environmental facts are legally inadequate in light of the relevant standard; rather, some quantified or detailed information is required." Sierra Club v. Bosworth, 352 F. Supp. 2d 909, 926 (D. Minn. 2005) (citation omitted). "NEPA requires more than a mere acknowledgment of impacts on adjacent lands; rather, the statute requires an *analysis* of those cumulative impacts." Id. at 927. Sierra Club asserts that, here, the cumulative impacts chapter simply lists various impacts that "could" occur, without detailing the magnitude of those effects. (See, e.g., SFEIS, FHWA 8185 ("Water quality can be impaired from development related activities, raising the concern for potential cumulative impacts. However, the regulatory structures currently in place reduce the potential for significant adverse impact to water quality resulting from the proposed action in combination with other public and private actions.").)

When read as a whole, FHWA's cumulative impacts analysis is a reasonable assessment, considering the relevant factors, which satisfies the "hard look" requirement under NEPA. The certainty expressed by FHWA – whether an impact that could occur, is unlikely to occur, or will occur – varies with the

specific impact discussed.  (FHWA 8164-94.)  Similarly, the specificity and quantitative nature of FHWA's analysis varies depending on the particular subject.  While, as Sierra Club points out, FHWA provides general analysis of cumulative water quality impact because there is no specific information of type and density of development anticipated and Wisconsin local government agencies are still developing stormwater management policies (FHWA 8184), it provides more specific analysis of impacts, such as noise, where precise decibel amounts are estimated for the Proposed Bridge and specific recommendations are made for keeping residential areas 200 feet from the roadway centerline if mitigation measures are not incorporated (FHWA 8179-80).

The analysis sets the geographic and time boundaries of the cumulative impacts assessment.  It then summarizes the existing condition of each potentially affected resource.  The analysis summarizes the impacts from the Proposed Bridge on each potentially affected resource and identifies other current and reasonably foreseeable future actions and their possible impacts on those resources.  Finally, the analysis discusses the potential for cumulative impacts on the resources and mitigation or minimization measures.  This approach constitutes a "meaningful cumulative impact analysis."

<u>Grand Canyon Trust v. FAA</u>, 290 F.3d 339, 345 (D.C. Cir. 2002).

The analysis was performed for 1) land development, 2) prime agricultural land, 3) social (neighborhoods and communities), 4) regional economy, 5) air quality, 6) noise, 7) wetlands, 8) water quality and quantity, 9) aquatic resources, 10) vegetation, 11) wildlife, 12) parks and recreational lands, 13) aesthetics, and 14) archeological and historic resources.  In the areas where cumulative impacts were likely, FHWA concluded that these impacts could be avoided or minimized through land use controls, other development controls, and roadway access restrictions.  (FHWA 8194.)  This analysis was thorough enough to meet NEPA's hard look requirement.

**D.  Whether FHWA Violated Section 4(f) of the Transportation Act**

**1.  Introduction**

Sierra Club asserts that FHWA violated § 4(f)(1) because it failed to evaluate a reasonable range of alternatives and violated § 4(f)(2) because it failed to provide a meaningful comparison of the degree of harm caused by each of the four build alternatives in order to meet the least-harm requirement.  Section 4(f) governs FHWA's approval of "a transportation program or project . . . requiring the use of publicly owned land of a public park, recreation area, or wildlife and

waterfowl refuge of national, State, or local significance, or land of an historic site

of national, State or local significance."  49 U.S.C. § 303(c).  Approval is permitted

only if

> (1) there is no prudent and feasible alternative to using that land;
> and
>
> (2) the program or project includes all possible planning to minimize
> harm to the park, recreation area, wildlife and waterfowl refuge, or
> historic site resulting from the use.

Id.

The § 4(f) standard is substantive, while NEPA's requirements are

procedural.  Friends of Marolt Park v. U.S. Dept. of Transp., 382 F.3d 1088, 1095

(10th Cir. 2004).

### 2.  Whether FHWA Considered a Reasonable Range of Alternatives in the EIS

The Secretary of Transportation cannot approve a project on § 4(f)

property, such as the Lower St. Croix National Scenic Riverway, unless "there is

no prudent and feasible alternative to using that land."  49 U.S.C. § 303(c)(1).  The

Court "must determine whether the Secretary "reasonably believed that . . . there

are no feasible alternatives or that alternatives do involve unique problems."

City of Bridgeton, 212 F.3d at 461 (citation omitted).  "[A]n alternative is

imprudent under section 4(f)(1) if it does not meet the *transportation* needs of a

project . . . [and] an alternative that does not effectuate the project's purposes is,

by definition, unreasonable, and need not be evaluated in detail under § 4(f)." Id.

(citation omitted).

Sierra Club does not clearly identify a reasonable alternative that FHWA

should have considered that would not have used § 4(f) resources.  As previously

explained, FHWA did not need to consider unreasonable alternatives that did not

meet the purpose of the project, such as the two-lane replacement bridge option.

As for the no-build and transit alternative – the only apparent alternative that

would avoid use of § 4(f) resources – FHWA adequately explained why this

alternative was not a feasible and prudent alternative because it would not meet

the transportation needs of the project.

FHWA identified the § 4(f) resources, determined if a "use" of those

resources would occur, described the impacts on the Lower St. Croix, including

constructive use such as impairment of visual qualities, and applied that analysis

to all build alternatives.  It further considered whether there were any feasible

and prudent avoidance alternatives.  Concluding that there were not, it evaluated

minimization measures.  FHWA complied with § 4(f)(1).

### 3. Whether FHWA Minimized Harm to § 4(f) Resources

If the Secretary of Transportation must use § 4(f) resources, the project must include "all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuse, or historic site resulting from the use." 49 U.S.C. § 303(c)(2). Sierra Club asserts that § 4(f)(2) requires FHWA to select the least-harm alternative from among the prudent alternatives and that FHWA failed to do so.

Sierra Club argues that FHWA failed to satisfy the least-harm standard because it failed to meaningfully compare the impacts of each of the build alternatives and then choose the alternative with the least overall harm. Sierra Club particularly asserts that the Lower St. Croix merits special consideration above other § 4(f) resources because of its WSRA designation. As the most substantial § 4(f) resource involved in this project, the Lower St. Croix merits particular attention. However, FHWA carries a statutory obligation to analyze and balance the effects on all § 4(f) resources. See 49 U.S.C. § 303(c)(2) (requiring "all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use"); City of Bridgeton, 212 F.3d at 462 (upholding agency's decision to choose alternative with greater effect

84

on historic § 4(f) resources than on § 4(f) neighborhood parks when agency

thoroughly discussed the choice and sought to mitigate adverse impacts on

historic resources).

Sierra Club claims that, here, FHWA failed to compare visual impacts or

the amount of roadway over the river. Sierra Club acknowledges that FHWA

does discuss visual impacts, but asserts that it does not explicitly compare the

magnitude of visual impacts resulting from each build alternative. Sierra Club

concludes that, in fact, the Proposed Bridge has the greatest visual impact of any

of the build alternatives.

Sierra Club also asserts that the comparisons FHWA did make were

incorrect. For instance, FHWA stated that the Proposed Bridge and Alternative C

would have less impact on the Wisconsin bluff than Alternatives D or E because

the bridge abutment is higher. (FHWA 9307.) Sierra Club counters that the

Proposed Bridge and Alternative C have a greater impact because they impact

undeveloped Wisconsin bluff, while Alternatives D and E impact more

developed bluff. (FHWA 4476.) FHWA acknowledged the differing impacts of

the alternatives on the Wisconsin bluff. The Court cannot say FHWA abused its

discretion by concluding that the Proposed Bridge caused less harm than

Alternatives D and E.  The fact that the bluff sites for Alternatives D and E are more developed is only one factor in deciding the overall harm caused to the Wisconsin bluffs by the various alternatives.  FHWA did not ignore that fact, but weighed multiple factors within its discretion.  See, e.g., City of Bridgeton, 212 F.3d at 462 ("In reviewing an agency's choice among feasible and prudent alternatives, we again apply the arbitrary and capricious standard of review.") (citation omitted); Concerned Citizens Alliance, Inc. v. Slater, 176 F.3d 686, 702 (3d Cir. 1999) (concluding agency did not abuse its discretion under § 4f(2) decision when agency studied "the various ways in which the alternatives would impact the [resource] and adequately weighed the results of the studies in selecting the preferred alternative [and] also considered the more intangible benefits and harms to [the resources] under the competing alternatives").

FHWA identified the impacts to § 4(f) resources by the various alternatives.  It then concluded that there was no feasible and prudent avoidance alternative and that all alternatives would have greater impacts on Section 4(f) resources that the Proposed Bridge.  (FHWA 9320-21.)  Finally, FHWA engaged in extensive planning to minimize harm to § 4(f) resources and selected the alternative that would cause the least harm to those resources.  For example, it

used bridge alinement to minimize crossing distance, bridge design to minimize

visual impact, and confined construction to a site previously disrupted by

construction.

FHWA discussed the visual impact to the Lower St. Croix Riverway in the

Final Section 4(f) Evaluation and also referred to the detailed discussion in the

SDEIS, which analyzed the visual impact of each alternative from different views

and discussed minimization and mitigation techniques for each, and in the SFEIS,

which analyzed the visual impact of the Proposed Bridge in detail.  (See Final

Section 4(f) Evaluation, FHWA 9312.)  Multiple minimization measures to

minimize harm were studied for each alternative.  (See, e.g., FHWA 9317.)  For

the Proposed Bridge, these measures included choosing a more perpendicular

bridge crossing, using an existing ravine for bridge approach location, and

choosing an extradosed bridge type.  (See, e.g., FHWA 9317-19.)  FHWA also

weighed the impact on competing § 4(f)resources such as the historic Lift Bridge

and local parks.  (See Final Section 4(f) Evaluation, FHWA 9320 (incorporating

discussion in SFEIS Chapter 3.3.8, FHWA 7874-77).)

FHWA "catalogued in detail the nature of each" affected 4(f) resources and

"discussed each site's location, its size, its function, its significance, the activities

associated with it, and the degree to which it would be adversely affected." <u>City of Bridgeton</u>, 212 F.3d at 462. Additionally, "most significantly," FHWA provided "plans to avoid, reduce, or mitigate" the adverse impacts on the § 4(f) resources. <u>Id.</u> After conducting an "extensive § 4(f) analysis," <u>id.</u>, FHWA determined that the Proposed Bridge "will result in the least impacts to Section 4(f) properties in the project area." (FHWA 9320.) FHWA did not abuse its discretion.

### E. Whether Sierra Club Has Met the Injunction Standard

Sierra Club requests a permanent injunction barring the federal government from funding or authorizing the Proposed Bridge.

> To determine whether permanent injunctive relief is warranted, [the Court] balance[s] three factors: (1) the threat of irreparable harm to the moving party; (2) the balance of harm between this harm and the harm suffered by the nonmoving party if the injunction is granted; and (3) the public interest.

<u>Taylor Corp. v. Four Seasons Greetings, LLC</u>, 403 F.3d 958, 967 (8th Cir. 2005) (citation omitted). The Court concludes that injunctive relief is warranted here.

First, there is a clear threat of irreparable harm to Sierra Club. The Court concludes that irreparable injury is likely in the absent an injunction. "Environment injury, by its nature, can seldom be adequately remedied by

88

money damages and is often permanent or at least of long duration, i.e., irreparable." Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 545 (1987). In this specific case, NPS has previously found that a substantially similar bridge would fundamentally, permanently, and negatively impact the Lower St. Croix's outstandingly remarkable values. NPS also previously found that no mitigation attempts would be effective. This is the definition of irreparable harm. Of course, the Court has held that NPS is not bound by its previous determination. But, because NPS completely ignored its previous finding and, with no explanation, reversed course, the Court has found that the 2005 Section 7 Evaluation was arbitrary and capricious. The Court cannot predict what NPS's ultimate Section 7 determination would be if it properly took into consideration its 1996 Section 7 Evaluation. But given the magnitude of irreparable harm predicted by NPS in its valid 1996 Section 7 Evaluation, weighed against a contrary opinion in the vacated and arbitrary 2005 Section 7 Evaluation, the Court concludes that this factor weighs heavily in favor of an injunction.

Second, the balance of the harms weighs towards granting the injunction. There is no cognizable harm to NPS from being enjoined from taking an action that is against the law. Without an injunction, NPS will set in motion

construction that is likely to cause irreparable injury to the Lower St. Croix and Sierra Club.

Third, the public interest weighs in favor of granting the injunction. The Court acknowledges that there is a public interest alleviating the serious traffic and safety problems associated with the Lift Bridge. However, the WSRA expresses a strong public interest that Wild and Scenic Rivers "and their immediate environments shall be protected for the benefit and enjoyment of present and future generations." 16 U.S.C. § 1271. Moreover, both the State of Minnesota and the State of Wisconsin affirmatively requested that the relevant portion of the Lower St. Croix be included in the Wild and Scenic River System for protection. The overriding public interest is in protecting the outstandingly remarkable values of the Lower St. Croix, particularly when the significant possibility for indefinite damage to those values is created by the Proposed Bridge. The 2005 Section 7 Evaluation recognizes that "[p]lacing a bridge where there previously was not one results in a fundamental change in the scenic qualities that existed in this portion of the Riverway at the time of designation." In 1996, NPS opined that the negative impact of a similar bridge could not be significantly mitigated. In this case, there is no evidence before the Court that

any work on the Proposed Bridge has begun, so an injunction will effectively

prevent irreparable harm. Therefore, the Court concludes that entry of a

permanent injunction is warranted. No bond is required for this permanent

injunction. Forest Park II v. Hadley, 336 F.3d 724, 734 (8th Cir. 2003).

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

1.  Federal Defendants' Motion for Summary Judgment [Docket No. 70] is **GRANTED IN PART** and **DENIED IN PART** as set forth in section 5 below.

2.  Motion for Summary Judgment of Intervenor Wisconsin Department of Transportation [Docket No. 73] is **GRANTED IN PART** and **DENIED IN PART** as set forth in section 5 below.

3.  Plaintiff's Motion for Summary Judgment [Docket No. 78] is **GRANTED IN PART** and **DENIED IN PART** as set forth in section 5 below.

4.  Intervenor State of Minnesota Department of Transportation's Motion for Summary Judgment [Docket No. 87] is **GRANTED IN PART** and **DENIED IN PART** as set forth in section 5 below.

5.  a.  Count I, Violations of WSRA and the APA by NPS and FHWA based on the claim that the Proposed Bridge project creates a new transportation corridor without restoring the existing corridor to natural conditions in violation of the CMP, is **DISMISSED**.

    b.  Judgment is entered in favor of Plaintiff on Count II,

Violations of the WSRA and the APA against NPS based on the claim that NPS's 2005 Section 7 Evaluation wrongly concluded that the Proposed Bridge project would not have a direct and adverse effect on the Lower St. Croix's scenic, recreational, wildlife, and other natural values.

c.     Count IV, Violations of the WSRA, Organic Act, General Authorities Act, and the APA by NPS based on the claim that NPS's approval of the Proposed Bridge is contrary to the non-degradation and non-impairment policies promulgated under those statutes, is **DISMISSED**.

d.     Count V, Violations of the WSRA and the APA by NPS based on the claim that NPS's grant of a new right-of-way for the Proposed Bridge does not protect the qualities for which the Lower St. Croix was designated a wild and scenic river, is **DISMISSED**.

e.     Count VI, Violations of the Transportation Act and the APA by FHWA, based on the claim that FHWA violated Section 4(f) of the Transportation Act by approving the Proposed Bridge without adequately considering alternatives that could have avoided use of the Lower St. Croix Riverway and approving a project that does not minimize harm to the Riverway, is **DISMISSED**.

f.     Count VII, Violations of NEPA and the APA by FHWA based on the claim that FHWA violated the NEPA due to inadequacies in the EISs and ROD is **DISMISSED**.

6.     Defendants Ken Salazar, Secretary of the Interior, and Jonathan B. Jarvis, Director of the National Park Service, are declared to have

violated the Wild and Scenic Rivers Act, 16 U.S.C. § 1271 et seq.; and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), in issuing a Section 7 Evaluation in October 2005 ("2005 Section 7 Evaluation") approving construction of a four-lane highway bridge (the "Proposed Bridge") over the Lower St. Croix River.

7.     The 2005 Section 7 Evaluation is **VACATED**.

8.     Defendants Ken Salazar, Secretary of the Interior, and Jonathan B. Jarvis, Director of the National Park Service, are permanently enjoined from authorizing, funding, or otherwise assisting in the construction of the Proposed Bridge unless and until a new Section 7 Evaluation is issued that complies with the dictates of this Memorandum of Law and Order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated:  March 11, 2010                    s/ Michael J. Davis
                                          Michael J. Davis
                                          Chief Judge
                                          United States District Court